GUTRIDE SAFIER LLP
Seth A. Safier (State Bar No. 197427)
  seth@gutridesafier.com
Marie A. McCrary (State Bar No. 262670)
  marie@gutridesafier.com
Todd Kennedy (State Bar No. 250267)
  todd@gutridesafier.com
100 Pine Street, Suite 1250
San Francisco, CA 94111
Telephone: (415) 639-9090
Facsimile:  (415) 449-6469

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARTIN BELTRAN, PAUL GIOFFRE and TERRY DEAN MYERS, individuals, on behalf of themselves, the general public, and those similarly situated,<br><br>                              Plaintiffs,<br><br>      v.<br><br>FCA US LLC,<br><br>                              Defendant. | CASE NO.<br><br>CLASS ACTION COMPLAINT FOR INVASION OF PRIVACY; INTRUSION UPON SECLUSION; WIRETAPPING IN VIOLATION OF THE CALIFORNIA INVASION OF PRIVACY ACT (CALIFORNIA PENAL CODE § 631); USE OF A PEN REGISTER IN VIOLATION OF THE CALIFORNIA INVASION OF PRIVACY ACT (CALIFORNIA PENAL CODE § 638.51); COMMON LAW FRAUD, DECEIT AND/OR MISREPRESENTATION; AND UNJUST ENRICHMENT<br><br>JURY TRIAL DEMANDED |

- 1 -
CLASS ACTION COMPLAINT

**TABLE OF CONTENTS**

INTRODUCTION ...........................................................................................................3

THE PARTIES.............................................................................................................5

JURISDICTION AND VENUE .....................................................................................5

TOLLING AND RELATED ARBITRATION PROCEEDING...................................6

SUBSTANTIVE ALLEGATIONS ...............................................................................7

    A.    Defendant Programmed the Websites to Include Third-Party Resources that Utilize Cookie-Based Tracking Technologies. ...............................................7

    B.    Defendant Falsely Informed Users That They Could "Opt-Out" of the Website's Use of Cookies. .......................................... 13

    C.    The Private Communications Intercepted and Collected Through Third-Party Cookies on Defendant's Websites........................................................... 29

        1.    Facebook Cookies........................................................................... 29

    D.    The Third Parties Intercept User Communications While in Transit. ................ 42

    E.    The Signaling and Addressing Information Intercepted by the Third Parties........................................................................................................ 45

    F.    The Private Communications Collected are Valuable. ....................................... 47

PLAINTIFFS' EXPERIENCES ................................................................................. 48

CLASS ALLEGATIONS ........................................................................................... 58

CAUSES OF ACTION ............................................................................................... 60

    First Cause of Action: Invasion of Privacy........................................................ 60

    Second Cause of Action: Intrusion Upon Seclusion.......................................... 63

    Third Cause of Action: Wiretapping in Violation of the California Invasion of Privacy Act (California Penal Code § 631) ......................................... 65

    Fourth Cause of Action: Use of a Pen Register in Violation of the California Invasion of Privacy Act (California Penal Code § 638.51) ............................... 69

    Fifth Cause of Action: Common Law Fraud, Deceit and/or Misrepresentation............ 71

    Sixth Cause of Action: Unjust Enrichment................................................. 73

PRAYER FOR RELIEF ............................................................................................. 74

Plaintiffs Martin Beltran, Paul Gioffre, and Terry Dean Myers ("Plaintiffs") bring this action on behalf of themselves the general public, and all others similarly situated against FCA US LLC ("Defendant" or "FCA"). Plaintiffs' allegations against Defendant are based on information and belief and the investigation of Plaintiffs' counsel, except for allegations specifically pertaining to Plaintiffs, which are based upon Plaintiffs' personal knowledge.

## INTRODUCTION

1.      This Class Action Complaint concerns egregious violations of consumer privacy and breach of consumer trust in violation of California law. When consumers visit Defendant's ecommerce websites (including, www.jeep.com (the "Jeep Website"), www.dodge.com (the "Dodge Website"), www.chrysler.com (the "Chrysler Website"), www.ramtrucks.com (the "Ram Website"), www.fiatusa.com (the "Fiat Website"), www.alfaromeousa.com (the "Alfa Romeo Website"), www.mopar.com (the "Mopar Website"), and www.stellantisfleet.com (the "Stellantis Website"), each a "Website" and collectively the "Websites"), Defendant displays to them a popup cookie consent banner. Defendant's cookie banner (which is similar in form and function on each of the Websites) discloses that the Website uses cookies but expressly gives users the option to control how they are tracked and how their personal data is used. Defendant assures visitors that they can choose to adjust their "Cookie Settings" as shown in the following example screenshot of the Dodge Website:



We use first and third-party cookies to optimize site functionality, enhance the user experience, personalize content and ads, and provide social media and other third-party features. Learn More          Cookie Settings          OK

2.      Like most internet websites, Defendant designed the Websites to include resources and programming scripts from third parties that cause those parties to place cookies and other similar tracking technologies on visitors' browsers and devices and/or transmit cookies along with user data. Unlike many websites, however, Defendant affirmatively represented that users could browse the Websites without being tracked, followed, or targeted by third-party data brokers and advertisers. Those representations were false.

3.      Even after users elect to adjust or manage "Cookie Settings" on the Websites and

choose to "Opt-Out of Cookies" in the cookie consent window (the "Cookie Settings" window), Defendant nonetheless caused third parties—including Meta Platforms, Inc. (Facebook) (the "Third Parties")—to place and/or transmit cookies that track users' website browsing activities and intercepted their private communications on the Websites.

4.    Contrary to users' express declination of cookies and tracking technologies on the Websites, Defendant nonetheless caused cookies, including the Third Parties' cookies, to be sent to Plaintiffs and other visitors' browsers, stored on their devices, and transmitted to the Third Parties along with user data. These cookies permitted the Third Parties to track and collect data in real time regarding visitors to the Websites' behaviors and communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data—including whether a user is located in California.

5.    The Third Parties analyze and aggregate this user data across websites and time for their own purposes and financial gain, including, creating consumer profiles containing detailed information about a consumer's behavior, preferences, and demographics; creating audience segments based on shared traits (such as Millennials, Californians, tech enthusiasts, etc.); and performing targeted advertising and marketing analytics. Further, the Third Parties share user data and/or user profiles to unknown parties to further their financial gain.

6.    This type of tracking and data sharing is exactly what visitors to the Websites sought to avoid when they clicked or selected the "Cookie Settings" link and then proceeded to select "Opt-Out of Cookies" and/or toggled off "Performance Cookies," "Functional Cookies," "Targeting Cookies," and "Social Media Cookies" in the Website's Cookie Settings. Defendant falsely told users of the Websites that it respected their privacy choices and would refrain from tracking and data sharing when users opted out of cookies. Despite receiving clear notice of users' lack of consent, Defendant ignored those choices and violated state statutes and tort duties owed to Plaintiffs and those similarly situated users of the Websites.

- 4 -
CLASS ACTION COMPLAINT

**THE PARTIES**

7.     Plaintiff Martin Beltran is, and was at all relevant times, an individual and resident of San Francisco, California. Plaintiff intends to remain in California and makes his permanent home there.

8.     Plaintiff Paul Gioffre is, and was at all relevant times, an individual and resident of San Diego, California. Plaintiff intends to remain in California and makes his permanent home there

9.     Plaintiff Terry Dean Myers is, and was at all relevant times, an individual and resident of San Ramon, California. Plaintiff intends to remain in California and makes his permanent home there

10.    Defendant FCA US LLC is a Delaware limited liability company with its principal place of business in Auburn Hills, Michigan.

**JURISDICTION AND VENUE**

11.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(d)(2). The aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs; and Plaintiffs and Defendant are citizens of different states.

12.    The injuries, damages and/or harm upon which this action is based, occurred or arose out of activities engaged in by Defendant within, affecting, and emanating from, the State of California. Defendant regularly conducts and/or solicits business in, engages in other persistent courses of conduct in, and/or derives substantial revenue from products and services provided to persons in the State of California. Defendant has engaged, and continues to engage, in substantial and continuous business practices in the State of California.

13.    Further, the Private Communications and data that Defendant causes to be transmitted to Third Parties are routed through servers located in California.

14.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in the state of California, including within this District.

15.    Plaintiffs accordingly allege that jurisdiction and venue are proper in this Court.

CLASS ACTION COMPLAINT

**TOLLING AND RELATED ARBITRATION PROCEEDING**

16. The delayed discovery rule applies to Plaintiffs' claims. Plaintiffs were unaware that, despite opting out of all third party non-essential cookies and tracking technologies on the Websites, Defendant nonetheless caused third-party cookies to be sent to their browsers, stored on their devices, and transmitted to the Third Parties along with their private user data. Plaintiffs could not reasonably have discovered this conduct at the time of their visits to the Websites because it occurred through hidden, technical processes not visible to ordinary users. Nothing about Plaintiffs' experiences on the Websites would have alerted a reasonable user that their selections were not being honored. Plaintiffs lacked the technical expertise and specialized tools necessary to determine whether the Websites honored their opt-out selections or instead continued transmitting their data notwithstanding those selections, and they did not discover Defendant's conduct until a later investigation revealed it.

17. On or about February 9, 2024, Plaintiffs' counsel notified Defendant, on behalf of a proposed class of users of the Websites, that Defendant was engaging in the conduct alleged herein, including causing third-party cookies and corresponding user data to be stored on consumers' devices and transmitted to third parties despite users' rejection of all non-essential cookies and tracking technologies. Despite this notice, Defendant did not disclose this conduct to users or modify its representations in the Website's cookie banner or Privacy Preference Center that users could reject such data sharing.

18. The Dodge Website's Terms and Conditions of Use ("TOU") contain an arbitration provision purporting to require Website visitors to arbitrate disputes with Defendant before the American Arbitration Association ("AAA").

19. Accordingly, on May 2, 2025, Plaintiff Myers filed a demand for arbitration in San Francisco with AAA against Defendant. *See* Ex. A. The arbitration demand asserted claims arising from the same conduct alleged herein.

20. Arbitrator Fred K. Morrison was appointed on June 23, 2025.

21. Following an initial conference on August 20, 2025, the Arbitrator authorized limited discovery concerning whether: (i) an enforceable arbitration agreement had been formed;

- 6 -
CLASS ACTION COMPLAINT

and (ii) whether Defendant's failure to timely pay arbitration fees constituted a waiver of any right to compel arbitration. *See* Ex. B.

22. Plaintiff Myers subsequently notified the Arbitrator that he intended to seek a judicial determination as to whether Defendant's failure to timely pay arbitration fees constituted a waiver of any right to compel arbitration and, accordingly, requested withdrawal of the arbitration proceeding. Defendant objected.

23. During a hearing held on December 16, 2025, the Parties agreed to stay the arbitration proceeding pending a judicial determination regarding arbitrability.

24. On December 17, 2025, the Arbitrator issued an order staying the arbitration proceeding. *See* Ex. C.

25. Despite exercising reasonable diligence, Plaintiffs were unaware of Defendant's conduct because Defendant affirmatively represented that users could opt out of or reject non-essential cookies and tracking technologies while simultaneously concealing that such tracking would occur regardless of users' selections. This combination of misrepresentation and omission prevented Plaintiffs from discovering their claims earlier. Defendant is not prejudiced by the timing of this action, as it has long been on notice of the conduct at issue, including through the February 9, 2024 demand letter describing substantially similar claims. These circumstances, including Defendant's concealment and misleading representations, warrant the tolling of the statute of limitations.

## SUBSTANTIVE ALLEGATIONS

**A.** **Defendant Programmed the Websites to Include Third-Party Resources that Utilize Cookie-Based Tracking Technologies.**

26. Every website, including the Websites, is hosted by a server that sends and receives communications in the form of HTTP requests, such as "GET" or "POST" requests, to and from Internet users' browsers. For example, when a user clicks on a hyperlink on the Websites, the user's browser sends a "GET" request to the Website's server. The GET request tells the Website's server what information is being requested (e.g., the URL of the webpage being requested) and instructs the Website's server to send the information back to the user (e.g.,

CLASS ACTION COMPLAINT

the content of the webpage being requested). When the Website server receives an HTTP request, it processes that request and sends back an HTTP response. The HTTP request includes the client's IP address which allows the Website server to identify the origin of the request and return the response.

27. An IP address (Internet Protocol address) is a unique numerical label assigned to each device connected to a network that uses the Internet Protocol for communication, typically expressed as four sets of numbers separated by periods (e.g., 192.168.123.132 for IPv4 addresses). IP addresses can identify the network a device is on and the specific device within that network. Public IP addresses used for internet-facing devices reveal geographical locations, such as country, city, or region, through IP geolocation databases.

28. As a result, Defendant knew that the devices used by Plaintiffs and Class members to access the Websites were located in California.

29. Defendant voluntarily integrated "third-party resources" from the Third Parties into its Websites' programming. "Third-party resources" refer to tools, content or services provided by third-parties, such as analytics tools, advertising networks, or payment processors, that a website developer utilizes by embedding scripts, styles, media, or application programming interface (API) into the website's code. Defendant's use of the third-party resources on the Websites is done so pursuant to agreements between Defendant and those Third Parties.

30. The Websites cause users' devices to store and/or transmit both first-party and third-party tracking cookies. Cookies are small text files sent by a website server to a user's web browser and stored locally on the user's device. As described below, cookies generally contain a unique identifier which enables the website to recognize and differentiate individual users. Cookie files are sent back to the website server along with HTTP requests, enabling the website to identify the device making the requests, and to record a session showing how the user interacts with the website.

- 8 -
CLASS ACTION COMPLAINT

31.     First-party cookies are those that are placed on the user's device directly by the web server with which the user is knowingly communicating (in this case, the Website's server). First-party cookies are used to track users when they repeatedly visit the same website.

32.     A third-party cookie is set by a third-party domain/webserver (e.g., www.facebook.com). When the user's browser loads a webpage (such as a webpage of the Websites) containing embedded third-party resources, the third-parties' programming scripts typically issue HTTP commands to determine whether the third-party cookies are already stored on the user's device and to cause the user's browser to store those cookies on the device if they do not yet exist. Third-party cookies include an identifier that allows the third-party to recognize and differentiate individual users across websites (including the Websites) and across multiple browsing sessions.

33.     As described further below, the third-party cookies stored on and/or loaded from users' devices when they interact with the Websites are transmitted to those third parties, enabling them to surreptitiously track in real time and collect users of the Websites' personal information, such as their browsing activities and private communications with Defendant, including the following:

- **Browsing History**: Information about the webpages a Website user visits, including the URLs, titles, and keywords associated with the webpages viewed, time spent on each page, and navigation patterns;

- **Visit History**: Information about the frequency and total number of visits to the Website;

- **Website Interactions:** Data on which links, buttons, or ads on the Website that a user clicks;

- **User Input Data**: The information the user entered into the Website's form fields, including search queries, the user's name, age, gender, email address, location, and/or payment information;

- **Demographic Information**: Inferences about age, gender, and location based on browsing habits and interactions with Website content;

CLASS ACTION COMPLAINT

- **Interests and Preferences**: Insights into user interests based on the types of Website content viewed, products searched for, or topics engaged with;

- **Shopping Behavior**: Information about the Website products viewed or added to shopping carts;

- **Device Information**: Details about the Website user's device, such as the type of device (mobile, tablet, desktop), operating system, and browser type;

- **Referring URL**: Information about the website that referred the user to the Website;

- **Session Information**: Details about the user's current Website browsing session, including the exact date and time of the user's session, the session duration and actions taken on the Website during that session;

- **User Identifiers**: A unique ID that is used to recognize and track a specific Website user across different websites over time; and/or

- **Geolocation Data**: General location information based on the Website user's IP address or GPS data, if accessible, including whether the user is located in California.

(Collectively, the browsing activities and private communications listed in the bullet points above shall be referred to herein as "Private Communications").

34. Third-party cookies can be used for a variety of purposes, including (i) analytics (e.g., tracking and analyzing visitor behavior, user engagement, and effectiveness of marketing campaigns); (ii) personalization (e.g., remembering a user's browsing history and purchase preferences to enable product recommendations); (iii) advertising/targeting (e.g., delivering targeted advertisements based on the user's consumer profile (i.e., an aggregated profile of the user's behavior, preferences, and demographics); and (iv) social media integration (e.g., enabling sharing of users' activities with social media platforms). Ultimately, third-party cookies are utilized to enhance website performance and generate revenue through data collection and targeted advertising.

CLASS ACTION COMPLAINT

35. Defendant is an automobile manufacturer and distributor that produces and markets vehicles under well-known brands including Dodge, Chrysler, Jeep, Ram, Fiat, and Alfa Romeo, and provides parts, service, and related offerings under the Mopar brand, as well as commercial fleet solutions through Stellantis Fleet. Defendant also owns and operates the Websites which correspond to each of these brands, which allow visitors to, among other things, obtain information about vehicles, parts, and services, explore features, pricing, and available options, and locate vehicles, dealerships, and related offerings.

36. As they interact with the Websites (e.g., by entering data into forms, clicking on links, and making selections), users of the Websites communicate Private Communications to Defendant, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data—including whether a user is located in California.

37. Defendant chose to install or integrate its Websites with resources from the Third Parties that, among other things, use cookies. Thus, when consumers visit the Websites, both first-party cookies and third-party cookies are placed on their devices and/or transmitted. This is caused by software code that Defendant incorporates into the Websites, or that Defendant causes to be loaded. Because Defendant controls the Websites' software code and is capable of determining whether a user is accessing a Website from California, it has complete control over whether first-party and third-party cookies are placed on its California users' devices and/or transmitted to third parties.

38. Defendant explained the third-party cookies it used on the Websites as follows in the FCA US Website Privacy Policy:

> We and our third-party providers use cookies, clear GIFs/pixel tags, JavaScript, local storage, log files, and other mechanisms in connection with our Websites, Apps, and other Services, in order to, for example, understand how our Services are used, track bugs and errors, provide operate, enable and improve our Services, verify account credentials, enable logins, track sessions, personalize content, prevent fraud, and protect and secure our Services, as well as for targeted marketing, advertising, and analytics purposes.
> **Cookies**. Cookies are alphanumeric identifiers that we transfer to your computer's hard drive through your web browser for record-keeping purposes.

- 11 -
CLASS ACTION COMPLAINT

Some cookies allow us to make it easier for you to navigate our Services, while others are used to enable a faster log-in process or to allow us to track your activities while using our Services…

**Clear GIFs.** Clear GIFs (also referred to as pixel tags and web beacons) are tiny graphics with a unique identifier, similar in function to cookies. In contrast to cookies, which are stored on your computer's hard drive, clear GIFs are embedded invisibly on web pages. We may use clear GIFs in connection with our Services and our marketing and advertising campaigns to, among other things, track the activities users of our Services, help us manage content, compile usage reports, and to help us track email response rates, identify when our emails are viewed, and track whether our emails are forwarded.

...

Targeted Advertising. We may work with third-party ad networks, channel partners, measurement services, and others ("third-party ad companies") to personalize content and advertising on our Services, and to manage our advertising on third-party sites, mobile apps, and online services. We and these third-party ad companies may use cookies, pixels tags, and other tools to collect activity information, IP address, device ID, advertising IDs, and other identifiers, and location information within our Services (as well as on third-party sites and services). We and these third-party ad companies use this information to provide you more relevant ads and content within our Services and on third-party sites and services, as well as to improve and evaluate the success of such ads and content.

We also may share certain customer list information (such as your email address) with third-party ad companies so that we can better target these customers and others with similar interests on third-party sites and platforms.[1]

39.     Further, Defendant explained the third-party cookies it used on the Websites as follows in its Cookie Policy:

### What are cookies?

Cookies are small text files stored on your computer or mobile device when visiting our website.

### What are other tracking tools?
Tracking tools are technologies that collect information to enable certain features and enhance the user experience on our website.

### Why we use cookies and/or other tracking tools
We use cookies and/or other tracking tools to ensure that we give you the best experience on our website. They enable us to provide you core functionalities such as security, network management and accessibility. They improve usability and performance through various features such as language recognition, search results and thereby improve what we offer to you. Our website could use also third parties' Tools to send advertising that is more relevant to you.

…

---

[1] FCA US Privacy Policy (updated 7/1/2024) (available at https://www.dodge.com/crossbrand_us/privacy) (the "Privacy Policy"). Defendant has subsequently updated the Privacy Policy.

CLASS ACTION COMPLAINT

**How to manage cookies and/or other tracking tools using our website**
To give you the best experience on the Tools management side, we classify Tools of this website in four categories, based on their purpose: technically necessary, comfort, performance, advertising.

You can enable and disable directly from this website each of the above Tools category (with the only exception of technically necessary ones, which are essential for the functioning of the website). In case of Third-Party Tools, this website will not use them after disabling (we cannot delete them).

Technically necessary: These Tools are essential for websites and their features to work properly. E.g.: authentication cookies.

Comfort: These Tools enable us to improve comfort and usability of websites and to provide various features. E.g.: comfort cookies can be used to store search results, language, character dimensions.

Performance: These Tools collect information about how you use websites. Performance Tools help us, for example, to identify especially popular areas of our website. In this way, we can adapt the content of our websites more specifically to your needs and thereby improve what we offer you.

Advertising: These Tools are used to send advertising and promotional information that is relevant to you, e.g. based on the web pages you visited…[2]

**B.    Defendant Falsely Informed Users That They Could "Opt-Out" of the Website's Use of Cookies.**

40.    When Plaintiffs and other consumers in California visited the Websites, the Websites immediately displayed to them a popup cookie consent banner. As shown in the example screenshot below from the Dodge Website, the cookie consent banner stated, "We use first and third-party cookies to optimize site functionality, enhance the user experience, personalize content and ads, and provide social media and other third-party features."[3] The banner then purported to provide users the opportunity to adjust or manage "Cookie Settings" on the Websites, as shown in the following example screenshot from the Dodge Website:

We use first and third-party cookies to optimize site functionality, enhance the user experience, personalize content and ads, and provide social media and other third-party features. Learn More          Cookie Settings          OK

---

[2] Dodge Website Cookie Policy (Version: October 2025) (available at https://www.dodge.com/eu-shared/cookie-policy.html) (the "Cookie Policy").

[3] The text on the Websites' cookie consent banners differed slightly but all the Websites' cookie consent banners offered users the option to click the "Cookie Settings" link to adjust their cookie settings.

CLASS ACTION COMPLAINT

(Screenshot of the Dodge Website's cookie banner stretched to enlarge text.)

41.     Plaintiffs and other users of the Websites who clicked or selected the "Cookie Settings" link were then directed to Defendant's "Cookie Settings" window, which is again substantially similar on each of the Websites, except for the branding/logo that appears at the top. As shown in the example screenshot below from the Dodge Website, Defendant represented in the Cookie Settings window that:

> When you visit our Site, we store first and third-party cookies on your browser to collect information which is used to measure and analyze Site performance and usage, enhance user experiences, personalize content and ads, and provide social media and other third-party features. The California Consumer Privacy Act (CCPA) gives California residents the right to opt out of the "sale" of their personal information, which as defined under the CCPA may include disclosures via certain third-party cookies and tags on our Site. You can choose to opt out of all third-party cookies on our Site, other than those that are "necessary," by turning off the category "Sales of Personal Information"; however, this may impact the functionality of the Site. You can also choose to turn off only certain types of cookies, such as targeting cookies.



42.     Users could navigate to the "Opt-Out of Cookies" tab on the Cookie Settings window. There, Defendant again represented to Website users that "Users of our Site can choose to opt out of all third-party cookies on our Site, other than those that are "necessary", by using

CLASS ACTION COMPLAINT

this toggle switch to turn off such cookies; however, this may impact the functionality of the Site. You can also choose to turn off only certain types of cookies, such as targeting cookies." Defendant presented users with toggle switches that allow them to enable or disable categories of cookies, including an option to opt out of all third-party cookies (including all "Performance Cookies," "Functional Cookies," "Targeting Cookies," and "Social Media Cookies," except "Essential Cookies," which are "necessary" for the Websites to function) as shown in the following exemplar screenshots from the Dodge Website:

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

CLASS ACTION COMPLAINT





CLASS ACTION COMPLAINT

43. Plaintiffs and other users of the Websites who adjusted the toggle switches to opt out of all third-party cookies (either by adjusting the "Opt-out of Cookies" toggle or by adjusting the toggles for each category of cookies), thereby indicating their choice and/or agreement to opt-out of, decline, or reject all such non-essential cookies and tracking technologies in use on the Websites, as well as the sale and sharing of their personal information, could then continue to browse the Websites, as the popup cookie consent banner and Cookie Settings window disappeared.

44. Defendant's popup cookie consent banner and Cookie Settings window led Plaintiffs, and all those users of the Websites similarly situated, to believe that they opted out of all non-essential cookies and tracking technologies. The cookie consent banner and Cookie Settings window further reasonably led Plaintiffs and those users of the Websites similarly situated to believe that Defendant would not allow third parties, through cookies, to access their Private Communications with the Websites, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers,

- 17 -
CLASS ACTION COMPLAINT

and/or geolocation data, upon clicking or selecting the "Cookies Settings" link and adjusting the toggle switches in the Cookie Settings window to opt out of or reject all non-essential cookies.

45.    Defendant's representations, however, were false. In truth, Defendant did not abide by Plaintiffs' or other users' wishes. When Plaintiffs and other users of the Websites clicked the "Cookie Settings" link and adjusted available toggle switches in the Cookie Settings window to opt-out of all non-essential cookies, including Performance, Functional, Targeting, and Social Media cookies, they provided notice to Defendant that they did not consent to the placement or transmission of third-party cookies that would allow those parties to obtain their Private Communications with the Websites.

46.    Nevertheless, even after receiving that notice, Defendant caused the Third-Party tracking cookies to be placed on users of the Websites' browsers and devices and/or transmitted to the Third Parties along with user data.

47.    In particular, when users clicked the "Cookie Settings" link and adjusted the toggle switches to opt-out of non-essential cookies, Defendant nonetheless continued to cause the Third Parties' cookies to be placed on users' devices and/or transmitted to the Third Parties along with user data, enabling them to collect user data in real time that discloses Website users' Private Communications, including browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data. In other words, even when consumers like Plaintiffs tried to protect their privacy by clicking or selecting the "Cookie Settings" link and adjusting the toggle switches to "Opt-Out of Cookies", Defendant failed to prevent cookies from being transmitted to Third Parties, enabling them to track user behavior and communications.

48.    Some aspects of the operations of the Third Party cookies on the Websites can be observed using specialized tools that log incoming and outgoing Website network transmissions. The following screenshots, obtained using one such tool, show examples of the Third Parties' cookies being transmitted from a Website user's device and browser to the Third Parties even

after the user clicked or selected the "Cookie Settings" link in the cookie consent banner and adjusted the toggle switch to "Opt-Out of Cookies" in each Website's Cookie Settings window:

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

CLASS ACTION COMPLAINT

**Jeep Website**

CLASS ACTION COMPLAINT

**Dodge Website**

CLASS ACTION COMPLAINT

**Chrysler Website**

CLASS ACTION COMPLAINT

**Ram Website**

CLASS ACTION COMPLAINT

**Fiat Website**

CLASS ACTION COMPLAINT

**Alfa Romeo Website**

| Name | Method | Status | Domain | Co...▼ |
|---|---|---|---|---|
| ⟨:⟩ ⊙ akam-sw-policy.json | GET | 200 | www.alfaromeousa.com | 39 |
| trigger/?id=853588651956... | GET | 200 | www.facebook.com | 8 |
| tr/?id=8535886519563398... | GET | 200 | www.facebook.com | 8 |
| trigger/?id=413096252794... | GET | 200 | www.facebook.com | 8 |
| tr/?id=4130962527948708... | GET | 200 | www.facebook.com | 8 |
| trigger/?id=853588651956... | GET | 200 | www.facebook.com | 8 |
| tr/?id=8535886519563398... | GET | 200 | www.facebook.com | 8 |
| trigger/?id=413096252794... | GET | 200 | www.facebook.com | 8 |
| tr/?id=4130962527948708... | GET | 200 | www.facebook.com | 8 |
| ☐ consentreceipts | OPTIO... | 200 | privacyportal.onetrust.com | 0 |
| ✖ mpel.js?v=20241231227 | GET | (failed) | chrysleralfaromeo.mpeasylin... | 0 |
| ▷ icon1.png | GET | 200 | c.betrad.com | 0 |
| ⟨:⟩ otPcTab.json | GET | 200 | cdn.cookielaw.org | 0 |
| ⟨:⟩ otFlat.json | GET | 200 | cdn.cookielaw.org | 0 |
| en.json | GET | 200 | cdn.cookielaw.org | 0 |
| otBannerSdk.js | GET | 200 | cdn.cookielaw.org | 0 |
| ⟨:⟩ www.alfaromeousa.com.js... | GET | 200 | script.crazyegg.com | 0 |
| ⟨:⟩ location | GET | 200 | geolocation.onetrust.com | 0 |
| ☐ 892a6b15-3c15-45cb-85c9... | GET | 200 | cdn.cookielaw.org | 0 |
| geoip2.js | GET | 200 | geoip-js.com | 0 |
| otSDKStub.js | GET | 200 | cdn.cookielaw.org | 0 |
| gtm.js?id=GTM-KBRW3M... | GET | 200 | www.googletagmanager.com | 0 |
| 5474.js?474243 | GET | 200 | script.crazyegg.com | 0 |
| BHNXN-HGD7E-Z5QAF-G... | GET | 200 | s.go-mpulse.net | 0 |
| Ⓣ data:application/fo... | GET | 200 | | 0 |
| Ⓣ data:application/fo... | GET | 200 | | 0 |
| Ⓣ data:application/fo... | GET | 200 | | 0 |
| Ⓣ data:application/fo... | GET | 200 | | 0 |
| gtm.js?id=GTM-5M692XP | GET | 200 | www.googletagmanager.com | 0 |
| ✖ mpel.js | GET | (failed) | chrysleralfaromeo.mpeasylin... | 0 |
| ⟨:⟩ consentreceipts | POST ... | 200 | privacyportal.onetrust.com | 0 |

CLASS ACTION COMPLAINT

**Mopar Website**

CLASS ACTION COMPLAINT

**Stellantis Website**



49.     The screenshots above show the "Network" tab of Chrome Developer Tools, which contains a list of HTTP network traffic transmissions between the user's browser and various third party websites while the user visited and interacted with Defendant's Websites at https://www.jeep.com,          https://www.dodge.com,          https://www.chrysler.com,

CLASS ACTION COMPLAINT

https://www.ramtrucks.com, and https://www.fiatusa.com. The screenshots depict only network traffic occurring *after* the user clicked or selected the "Cookie Settings" link in the cookie consent banner and adjusted the toggle switch to "Opt-Out of Cookies" in the Website's Cookie Settings window. As shown above, despite the user's election to "Opt-Out of Cookies," the user's interactions with each of the Websites resulted in the user's browser making a large number of GET and POST HTTP requests to third party web domains such as www.facebook.com, and others. As further shown in the right-hand column of the screenshots, the user's browser sent cookies along with those HTTP requests to the third parties. These screenshots demonstrate that Defendant caused third-party cookie data and users' Private Communications to be transmitted to Third Parties, even after consumers declined all cookies and tracking technologies by clicking or selecting the "Cookie Settings" link in the cookie consent banner and adjusted the toggle switch to "Opt-Out of Cookies" in the Website's Cookie Settings window. All of these network calls are made to the Third Parties without the user's knowledge, and despite the user's election to "Opt-Out of Cookies."

50.    Plaintiffs' and other users of the Websites' Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, were surreptitiously obtained by the Third Parties via these cookies.

51.    As users interact with the Websites, even after clicking or selecting the "Cookie Settings" link in the cookie consent banner and adjusting the toggle switch to "Opt-Out of Cookies" in the Website's Cookie Settings window, thereby declining the use of non-essential cookies and similar technologies for performance analysis and advertising, as well as the sale or sharing of the user's personal information with third parties for such functions, or other purposes, more data regarding users' behavior and communications are sent to third parties, alongside the cookie data. The third-party cookies that Defendant wrongfully allows to be stored on users' devices and browsers, and to be transmitted to the Third Parties, cause the Third Parties to track and collect data on users' behaviors and communications, including Private Communications,

- 28 -

CLASS ACTION COMPLAINT

on the Websites. Because third-party cookies cause Third Parties to track users' behavior across the Internet and across time, user data can be correlated and combined with other data sets to compile comprehensive user profiles that reflect consumers' behavior, preferences, and demographics (including psychological trends, predispositions, attitudes, intelligence, abilities, and aptitudes). These Third Parties monetize user profiles for advertising, sales, and marketing purposes to generate revenue and target advertising to Internet users. Advertisers can gain deep understanding of users' behavioral traits and characteristics and target those users with advertisements tailored to their consumer profiles and audience segments.

52.    The Third Party code that the Websites cause to be loaded and executed by the user's browser constitutes a wiretap because, when it is executed, it causes the Third Parties—separate and distinct entities from the parties to the conversations—to use cookies to eavesdrop upon, record, extract data from, and analyze conversations to which they are not parties. When the Third Parties use their respective wiretaps on users of the Websites' Private Communications, the wiretaps are not like tape recorders or "tools" used by one party to record the other. The Third Parties each have the capability to use the contents of conversations they collect through their respective wiretaps for their own purposes as described in more detail below.

C.    **The Private Communications Intercepted and Collected Through Third-Party Cookies on Defendant's Websites.**

1.    **Facebook Cookies.**

53.    Defendant causes cookies to be transmitted to and from users' browsers and devices to and from the **facebook.com** domain, on all the Websites, even after users elect to reject all non-essential cookies (including Performance, Functional, Targeting, and Social Media cookies). This domain is associated with Meta's digital advertising and analytics platform that collects user information via cookies to assist Meta in performing data collection, behavioral analysis, user retargeting, and analytics.[4] Meta serves targeted ads to web users across Meta's ad network, which spans millions of websites and apps.

---

[4] https://www.facebook.com/privacy/policies/cookies/.

CLASS ACTION COMPLAINT

54. Cookies, which were sent along with data transmissions to Meta even after users had opted out of non-essential cookies, help Meta track whether users complete specific actions after interacting with an ad (e.g., clicking a link or making a purchase) and provide analytic metrics that advertisers use to measure ad campaign performance. For instance, the following type of data—including cookie data—was sent to Meta after users opted out of cookies on the Jeep Website:

CLASS ACTION COMPLAINT



55.    Similarly, the following type of data—including cookie data—was sent to Meta after users opted out of cookies on the Dodge Website:



CLASS ACTION COMPLAINT



56.    Similarly, the following type of data—including cookie data—was sent to Meta after users opted out of cookies on the Chrysler Website:



57.    Similarly, the following type of data—including cookie data—was sent to Meta after users opted out of cookies on the Ram Website:





58.     Similarly, the following type of data—including cookie data—was sent to Meta after users opted out of cookies on the Fiat Website:





59.    Similarly, the following type of data—including cookie data—was sent to Meta after users opted out of cookies on the Alfa Romeo Website:







60.    Similarly, the following type of data—including cookie data—was sent to Meta after users opted out of cookies on the Mopar Website:

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

CLASS ACTION COMPLAINT

CLASS ACTION COMPLAINT

61.    The "ev" parameter shown in the screenshots above refers to "event." For example, with the Jeep Website, the "ev" parameter is "SubscribedButtonClick," informing Facebook that the user clicked on a button on the Website.

62.    The parameters above whose names begin with "cd" are "custom dimension" parameters, and provide Facebook with a variety of data pertaining to the user's activity on the website. For example, on the Jeep Website, the "cd[buttonFeatures]" parameter tells Facebook that the user clicked on a button containing the text "EXPLORE YOUR GRAND CHEROKEE."

63.    The "fbp" parameter contains a unique id that causes Facebook to track the user across the internet, regardless of whether the user is logged into Facebook.

64.    The "dl" parameter is "document location," and discloses to Facebook the specific webpage that the user was viewing (e.g., https://www.jeep.com).

65.    The "rl" parameter refers to the "referer location," and discloses to Facebook the url that the user visited previously.

66.    The "ts" parameter corresponds to a "Timestamp," and tells Facebook the exact time—down to the millisecond—at which the user viewed the page.

67.    The "sw" and "sh" parameters stand for "screen width" and "screen height," and correspond to the display the user was viewing when the event was recorded.

68.    The "c_user" cookie shown above enables Facebook to identify a specific user when they are logged in to their account. The "c_user" cookie stores a user's unique ID, which is associated with their Facebook profile. This ID enables Facebook to track user interactions on its platform and across sites that use Facebook plugins, such as adding items to a cart, clicking "Like" buttons, or engaging with comment sections. When combined with other data sent to the Facebook domain, this cookie allows Meta to track users' browsing activities. Facebook uses this data for various purposes, such as personalizing content, enhancing ad targeting accuracy, and refining its user experience.

69.    In particular, by identifying users who have shown interest in certain products or content, the facebook.com cookies enable Meta's advertising platform to enable advertisers to show relevant ads to those users when they visit other websites within Meta's ad network.[5] These cookies allow Meta to collect data on how users interact with websites, regardless of whether they have a Facebook account or are logged in.[6]

70.    The facebook.com cookies allow Meta to obtain and store at least the following user data: (i) browsing history, (ii) visit history, (iii) website interactions, (iv) user input data, (v) demographic information, (vi) interests and preferences, (vii) shopping behaviors, (viii) device information, (ix) referring URLs, (x) session information, (xi) user identifiers, and (xii) geolocation data—including whether a user is located in California.[7]

71.    In addition, each and every data transmission to Facebook included the user's IP address, as well as the user's "user-agent" header:

| user-agent | Mozilla/5.0 (Macintosh; Intel Mac OS X 10_15_7) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/121.0.0.0 Safari/537.36 |
|---|---|

[5] *Id.*; https://allaboutcookies.org/what-data-does-facebook-collect.
[6] https://allaboutcookies.org/what-data-does-facebook-collect.
[7] *Id.*

CLASS ACTION COMPLAINT

72. The user-agent header enables Facebook to determine the user's device type, operating system, and browser. The IP address enables Facebook to determine, among other things, the user's geolocation.

73. Each and every data transmission to Facebook included the "referer" header, disclosing the specific webpage that the user was visiting. For example:

referer                                https://www.jeep.com/

74. Meta utilizes the data collected through the facebook.com cookies for its own purposes, including by using the data to tailor content and target advertisements to users. This includes practices such as (i) **Ad Targeting and Retargeting**, in which Meta uses the facebook.com cookie to track users' online behavior across different sites, building a profile based on their browsing habits, purchases, and interactions. This profile enables Facebook to deliver highly targeted ads within the Facebook ecosystem and on other sites that are part of Facebook's Audience Network; (ii) **Conversion Tracking**, in which Meta uses the facebook.com cookie to enable business partners to track specific actions users take after viewing or clicking on a Facebook ad, such as making a purchase or signing up for a newsletter; (iii) **Audience Insights and Analytics**, in which Meta uses the facebook.com cookie to provide data to businesses on user demographics, interests, and behaviors across their sites and apps; and (iv) **Cross-Device and Cross-Platform Tracking**, in which Meta uses the facebook.com cookie to support tracking users across devices and platforms, so that ads are targeted consistently regardless of the device a user is on. This ensures that advertisers can follow users across devices.

75. The Mopar and Stellantis websites caused extensive user data—including cookie data—to be sent to a large variety of third parties other than Facebook. Mopar caused such data to be sent to Google (at analytics.google.com); X/Twitter (at analytics.twitter.com); Microsoft (at bat.bing.com), and many others. Stellantis caused such data to be sent to, at least, Google (at adservice.google.com and doubleclick.net); Yahoo (at analytics.yahoo.com); and Adobe (at demdex.net).

CLASS ACTION COMPLAINT

**D.    The Third Parties Intercept User Communications While in Transit.**

76.    On information and belief, the Third Parties intercept user communications while those communications are in transit from consumers' browsers to Defendant's Websites. The Third Parties operate large-scale data ingestion systems designed to receive, read, and act upon incoming data streams in real time, as the data is transmitted over the network, before it is committed to storage. As the user data is transmitted over the wire, it is transmitted as a raw payload that cannot be used until the Third Party reads and processes it using at least the steps described below. These steps necessarily require contemporaneous access to the contents of the communications while they are in transit.

77.    First, the Third Parties must read the data in real time in order to ***transform*** it into a usable format for subsequent processing. Transforming, for example, may involve converting long html-encoded strings and decoding them to a format such as Unicode Transformation Format, which is more amenable to subsequent processing.

78.    Second, the Third Parties read the data in real time in order to ***deduplicate*** events transmitted through multiple channels. Most websites transmit the same user interaction twice: both directly from the user's device and separately through a server-to-server API, to ensure reliability.[8] Third Party platforms encourage this redundant configuration and automatically compare identifiers contained within the transmitted data—such as event identifiers and device identifiers—to determine whether multiple transmissions correspond to the same user action.[9] This deduplication occurs as the communications are received, before they are stored.

79.    Third, the Third Parties read and analyze incoming communications in real time to ***validate*** and ***filter*** the data, including to detect invalid, malicious, or anomalous transmissions and to determine whether the data complies with internal processing rules. These determinations

---

[8] For example, Facebook's server-to-server API is the **Meta Conversions API**. On information and belief, each of the Third Parties uses a server-to-server API to collect user data.

[9] For example, Facebook recommends that websites use a "redundant setup" whereby "advertisers implement the Conversions API alongside their Meta Pixel." *See* "Handling Duplicate Pixel and Conversions API Events," available at https://developers.facebook.com/docs/marketing-api/conversions-api/deduplicate-pixel-and-server-events. Facebook confirms that its system automatically deduplicates events using various parameters included with the data, such as "event_id," "event_name," "fbp," and "external_id." *Id.*

- 42 -
CLASS ACTION COMPLAINT

must be made immediately upon receipt of the communication in order for the Third Parties' systems to function.

80.    Fourth, the Third Parties perform real-time *analytics* on user communications to determine their meaning and significance. This processing is used to interpret the data, associate it with particular users or devices, and to determine what real-time events or actions should be taken in response, such as triggering advertising delivery, notifications, or other automated responses. This step typically involves applying artificial intelligence and machine learning algorithms to the data. These determinations occur while the data is in motion, prior to final storage.

81.    To accomplish each of the functions described above, the Third Parties employ real-time stream processing platforms specifically designed to operate on data "in flight"—that is, after it is transmitted from a user's browser but before it is committed to the Third Parties' storage. Examples of such platforms include Apache Flink, Kafka, and Amazon Kinesis. Industry documentation confirms that these systems are designed to read, transform, analyze, and act upon data streams as they are received.

82.    For example, Meta has publicly described its proprietary real-time stream processing platform that ingests data transmitted from users' devices and websites, applies real-time transformations and personalization, and only thereafter stores the data in backend data warehouses, as illustrated in the following diagram created by Facebook:[10]

---

[10] XStream: Stream Processing Platform at Facebook (video) at 1:07 (available at https://www.youtube.com/watch?v=DNI54vc1ALQ).

CLASS ACTION COMPLAINT

**Streaming Data Flow at FB**

A typical streaming data flow...

Devices

Web

Services

Others

Event Producers

Messaging Pipe = Scribe

Stream Processing Pipelines

Publish / Serve

Scuba for quick analytics and troubleshooting

Scribe, messaging bus

Warehouse, for retention and complex queries

*High Availability and Low Latency are important to our business*

83.     As the diagram confirms, the data is sent from consumers' "Devices" and from the "Web," and then goes through the Stream Processing Pipelines *before* being stored in the data "Warehouse."

84.     Facebook's Stream Processing Pipelines perform a wide variety of real-time analytics, transformations, and AI and machine learning on the data prior to storage:[11]

**Use Cases @ Facebook**

Diversity of Use Cases

**Stream Analytics**

- **Time series analytics** – calculate metrics over time windows and stream to another Scribe category, dashboard or Scuba

- **Real time dashboards/Scuba** – aggregate and process Scribe to feed dashboards or another Scribe category

- **Real time metrics** – Custom metrics or triggers for real time monitoring, notifications or alarms

**Stream Transform**

- **Clean, enrich, organize, and transform raw** Scribe prior to loading to warehouse reducing or eliminating batch ETL steps

- **Common built-in operators** to transform, aggregate, and filter streaming data

**Real-Time AI/ML**

- **Enable various stages of the ML life cycle** E.g., feature engineering

- Enable **predictive analytics, fraud detection**, real-time personalization, and other advanced analytics use cases

---

[11] *Id.* at 2:05.

- 44 -
CLASS ACTION COMPLAINT

85.    As the diagram confirms, Facebook does not merely store incoming data for later review; rather, before the data is stored, Facebook contemporaneously reads and processes it—including by reading the data, cleaning it, applying "real-time personalization" to associate it with a particular user, and analyzing its contents as necessary to generate real-time responses.

86.    On information and belief, the other Third Parties also use ingest-phase processing platforms that perform real-time analytics and filtering on incoming data streams before storage.

87.    Accordingly, the Third Parties' platforms do not operate as passive recipients that merely record user communications. Instead, they function as active interceptors that contemporaneously read and process the contents of user communications—including the Private Communications—by transforming, deduplicating, validating and filtering and analyzing in real time while those communications are in transit between the user's browser and Defendant's Website.

**E.    The Signaling and Addressing Information Intercepted by the Third Parties.**

88.    The "signaling" and "addressing" information captured and recorded by the Third Parties includes TCP and/or UDP port numbers associated with outgoing communications initiated by Plaintiffs' and Class Members' browsers and devices. In the context of Internet Protocol (IP) networking, port numbers function as sub-addresses that direct traffic to specific software processes. By recording these port numbers, the Third Parties identify and distinguish specific network connections and the communicating endpoints involved (e.g., a Plaintiff's or Class Member's IP address and TCP/UDP source port communicating with a Third Party's destination IP address and destination port such as 443). These port numbers constitute addressing information associated with the communications initiated by Plaintiffs' and Class Members' browsers and devices and fall within the "instruments" and "facilities" contemplated by California Penal Code § 638.50(b).

89.    The "signaling" information also includes protocol-level metadata recorded by the Third Parties during connection establishment and session management, such as the initiation and acceptance of TCP connections and the TLS handshake and negotiation metadata used to

establish HTTPS sessions. This signaling information is transmitted by Plaintiffs' and Class Members' devices to initiate, coordinate, and manage electronic communications with the Third Parties. Because this metadata enables management of the connection rather than the substance of the message, it constitutes record information regarding the characteristics of the communication, rather than communication content, and falls squarely within the statutory definition of a pen register.

90.    Additionally, the Third Parties record HTTP request header metadata, such as the "Host" header and connection-management headers (e.g., "Connection" in HTTP/1.1), which function as digital "dialing" information. Just as a traditional pen register records the number dialed to reach a destination, these headers identify the intended web origin (via "Host") and specify how the client requests the connection be handled for that request (e.g., whether to keep the connection open). This header information is transmitted as part of the Plaintiffs' and Website users' HTTP requests and, together with the destination network address and port, enables the receiving Third Party to identify and log the destination and handling characteristics of Plaintiffs' and Website users' communications, separate from any underlying user input or message content.

91.    Finally, the Third Parties' receiving infrastructure (e.g., servers, edge services, and/or load balancers) observes and records network-level and transport-level routing and addressing metadata associated with communications initiated by Plaintiffs' and Website users' browsers and devices. This metadata includes destination IP addresses, port identifiers (such as 443 for HTTPS), and related connection and session attributes, including connection initiation and termination timestamps, connection duration, and identifiers such as the protocol used (TCP or UDP), the source IP address, the source port, the destination IP address, and the destination port. The Third Parties use this information in real time to identify and log the origin and destination endpoints of Plaintiffs' and Website users' electronic communications and the characteristics of those connections, separate from any substantive "message" or "contents" carried at the higher-level Application layer.

CLASS ACTION COMPLAINT

**F.     The Private Communications Collected are Valuable.**

92.     As part of its regular course of business, Defendant targets California consumers by causing the Third Parties to extract, collect, maintain, distribute, and exploit for Defendant's and the Third Parties' profit, all of the Private Communications transferred by the cookies which Defendant causes to be placed on Plaintiffs' and other California users of the Websites' devices without their knowledge or consent. Defendant knew the location of consumers like Plaintiffs and the Class members either prior to or shortly after causing the Third Parties to use cookies on their devices.

93.     The Private Communications that the Third Parties track and collect by way of the cookies on the Websites are valuable to Defendant as well as the Third Parties. Defendant can use the data to create and analyze the performance of marketing campaigns, website design, product placement, and target specific users or groups of users for advertisements. For instance, if Defendant wanted to market certain of its automobiles to consumers to consumers in California, Defendant could use the data collected by the Third Parties to monitor the location of users who visit webpages related to specific products, then advertise similar products to those particular users when they visit other webpages. The third-party cookies also enable Defendant to target online advertisements to users when they visit *other* websites, even those completely unrelated to Defendant and its products.

94.     Data reflecting users' browsing activity allows Defendant to identify behavioral patterns, preferences, and interests relating to Defendant's products. At scale, this data enables Defendant to assess trends across its brands and within the broader automobile market. Defendant monetizes this data by leveraging it to increase user engagement, advertising effectiveness, and overall revenue.

95.     The value of the Private Communications tracked and collected by the Third Parties using cookies on the Websites can be quantified. Legal scholars observe that "[p]ersonal information is an important currency in the new millennium."[12] Indeed, "[t]he monetary value of personal data is large and still growing, and corporate America is moving quickly to profit

---

[12] *See* Paul M. Schwartz, *Property, Privacy and Personal Data*, 117 Harv. L. Rev. 2055, 2056–57 (2004).

CLASS ACTION COMPLAINT

from the trend." *Id*. "Companies view this information as a corporate asset and have invested heavily in software that facilitates the collection of consumer information." *Id*.

96.    Numerous empirical studies quantify the appropriate value measure for personal data. Generally, the value of personal data is measured as either the consumer's willingness to accept compensation to sell her data or the consumer's willingness to pay to protect her information.

97.    By falsely representing consumers' ability to decline non-required cookies, and by aiding, agreeing with, employing, permitting, or otherwise enabling the Third Parties to collect users' Private Communications, Defendant unjustly enriches itself at the expense of consumer privacy and autonomy. Defendant deprives consumers of the ability to decide whether, and on what terms, their data may be monetized.

**PLAINTIFFS' EXPERIENCES**

**Martin Beltran**

98.    Plaintiff Beltran visited the Dodge Website to seek and obtain information about Defendant's products, while located in California, on one or more occasions during the last four years.

99.    Plaintiff Beltran's visits to the Dodge Website were consistent with a typical Website user's visits seeking information about Defendant's products. Specifically, Plaintiff Beltran is not a consumer advocate, a "tester," or a compliance auditor that visited the Website to test or evaluate Defendant's privacy practices.

100.    When Plaintiff Beltran visited the Dodge Website, the Website immediately detected that he was a visitor in California and presented him with Defendant's popup cookie consent banner, which provided the option to select the "Cookie Settings" link. Plaintiff Beltran viewed Defendant's representation on the popup cookie consent banner that, "We use first and third-party cookies to optimize site functionality, enhance the user experience, personalize content and ads, and provide social media and other third-party features."

101.    Desiring to opt out of or reject cookies on the Dodge Website, Plaintiff Beltran clicked or selected the "Cookie Settings" link. The Dodge Website then presented him with the

CLASS ACTION COMPLAINT

"Cookie Settings" window. There, Plaintiff Beltran saw Defendant's additional representations that, "The California Consumer Privacy Act (CCPA) gives California residents the right to opt out of the 'sale' of their personal information, which as defined under the CCPA may include disclosures via certain third-party cookies and tags on our Site. You can choose to opt out of all third-party cookies on our Site, other than those that are 'necessary', by turning off the category 'Sales of Personal Information'[.]" In navigating to the "Opt-Out of Cookies" tab, Plaintiff Beltran also saw Defendant's further representation that, "Users of our Site can choose to opt out of all third-party cookies on our Site, other than those that are 'necessary', by using this toggle switch to turn off such cookies[.]" Plaintiff Beltran saw the referenced toggle switch, and also that he could opt-out of or reject all categories of cookies, including Performance, Functional, Targeting, and Social Media cookies, other than those "Essential" for the Website to function.

102.    Plaintiff Beltran adjusted the toggle switch to "Opt-Out of Cookies" in the Dodge Website's Cookie Settings window to opt out of or reject all categories of cookies in use on the Dodge Website, including all Performance, Functional, Targeting, and Social Media cookies, except those "Essential" for the Dodge Website to function. Plaintiff Beltran believed that adjusting the toggle switches found on the Cookie Settings window on the Dodge Website would allow him to opt out of, decline, and/or reject all non-essential cookies and other tracking technologies (inclusive of those cookies that cause the disclosure of tracking data to third-party advertising networks, analytics services, and/or social media companies for the purposes of providing personalized content, advertising, and social media features, as well as enabling the sharing or sale of his personal information).

103.    In adjusting the available toggle switches to opt out of or reject all such cookies, Plaintiff Beltran gave Defendant notice that he did not consent to the use or placement of cookies and tracking technologies while browsing the Dodge Website. Further, Plaintiff Beltran specifically rejected, based on Defendant's representations, Performance, Functional, Targeting, and Social Media cookies. In reliance on these representations and promises, only then did Plaintiff Beltran continue browsing the Dodge Website.

104. Even before the popup cookie consent banner or Cookie Settings window appeared on the screen, Defendant nonetheless caused cookies and tracking technologies, including those used for personalized content, advertising, and social media features, to be placed on Plaintiff Beltran's device and/or transmitted to the Third Parties along with user data, without Plaintiff Beltran's knowledge. Accordingly, the popup cookie consent banner's and Cookie Settings window's representations to Plaintiff Beltran that he could reject the use and/or placement of all non-essential cookies and tracking technologies while he browsed the Dodge Website were false. Contrary to what Defendant made Plaintiff Beltran believe, he did not have a choice about whether third-party cookies would be placed on his device and/or transmitted to the Third Parties along with his user data; rather, Defendant had already caused that to happen.

105. Then, as Plaintiff Beltran continued to browse the Dodge Website in reliance on the promises Defendant made in the cookie consent banner and Cookies Settings window, and despite Plaintiff Beltran's clear rejection of the use and/or placement of such cookies and tracking technologies, Defendant nonetheless continued to cause the placement and/or transmission of cookies along with user data, including those involved in providing personalized content, advertising, and social media features from the Third Parties on his device. In doing so, Defendant permitted the Third Parties to track and collect Plaintiff Beltran's Private Communications as Plaintiff Beltran browsed the Dodge Website.

106. Defendant's representations that consumers could opt out of or reject all non-essential categories of cookies, including Performance, Functional, Targeting, and Social Media cookies, while Plaintiff Beltran and users browsed the Jeep Website, were untrue. Had Plaintiff Beltran known this fact, he would not have used the Dodge Website. Moreover, Plaintiff Beltran reviewed the popup cookie consent banner and Cookie Settings window prior to using the Dodge Website. Had Defendant disclosed that it would continue to cause cookies and tracking technologies to be stored on consumers' devices even after they choose to opt-out of or reject all non-essential cookies, Plaintiff Beltran would have noticed it and would not have used the Website or, at a minimum, he would have interacted with the Dodge Website differently.

CLASS ACTION COMPLAINT

107. Plaintiff Beltran continues to desire to browse content featured on the Websites. Plaintiff Beltran would like to browse websites that do not misrepresent that users can opt out of or reject all non-essential cookies and tracking technologies. If the Websites were programmed to honor users' requests to reject all non-essential cookies and tracking technologies, Plaintiff Beltran would likely browse the Websites again in the future, but will not do so until then. Plaintiff Beltran regularly visits websites that feature content similar to that of the Websites. Because Plaintiff Beltran does not know how the Websites are programmed, which can change over time, and because he does not have the technical knowledge necessary to test whether the Websites honor users' requests to opt out of or reject all non-essential cookies and tracking technologies, Plaintiff Beltran will be unable to rely on Defendant's representations when browsing the Websites in the future absent an injunction that prohibits Defendant from making misrepresentations on the Websites. The only way to determine what network traffic is sent to third parties when visiting a website is to use a specialized tool such as Chrome Developer Tools. As the name suggests, such tools are designed for use by "developers" (i.e., software developers), whose specialized training enables them to analyze the data underlying the HTTP traffic to determine what data, if any, is being sent to whom. Plaintiff Beltran is not a software developer and has not received training with respect to HTTP network calls.

**Paul Gioffre**

108. Plaintiff Gioffre visited the Jeep Website to seek and obtain information about Defendant's products, while located in California, on one or more occasions during the last four years.

109. Plaintiff Gioffre's visits to the Jeep Website were consistent with a typical Website user's visits seeking information about Defendant's products. Specifically, Plaintiff Gioffre is not a consumer advocate, a "tester," or a compliance auditor that visited the Website to test or evaluate Defendant's privacy practices.

110. Plaintiff Gioffre visited the Jeep Website to research vehicle models, configurations, and features. During those visits, Plaintiff Gioffre viewed information regarding electric Jeep vehicles and the Jeep Wrangler.

CLASS ACTION COMPLAINT

111.   When Plaintiff Gioffre visited the Jeep Website, the Website immediately detected that he was a visitor in California and presented him with Defendant's popup cookie consent banner, which provided the option to select the "Cookie Settings" link.

112.   Desiring to opt out of or reject cookies on the Jeep Website, Plaintiff Gioffre clicked or selected the "Cookie Settings" link. The Jeep Website then presented him with the "Cookie Settings" window. There, Plaintiff saw Defendant's additional representations that he could "choose to opt out of all third-party cookies on our Site, other than those that are 'necessary'…" Plaintiff Gioffre saw the referenced toggle switch, and also that he could opt-out of or reject all categories of cookies, including Performance, Functional, Targeting, and Social Media cookies, other than those "Essential" for the Website to function.

113.   Plaintiff Gioffre adjusted the toggle switch to "Opt-Out of Cookies" in the Jeep Website's Cookie Settings window to opt out of or reject all categories of cookies in use on the Jeep Website, including all Performance, Functional, Targeting, and Social Media cookies, except those "Essential" for the Jeep Website to function. Plaintiff Gioffre believed that adjusting the toggle switches found on the Cookie Settings window on the Jeep Website would allow him to opt out of, decline, and/or reject all non-essential cookies and other tracking technologies (inclusive of those cookies that cause the disclosure of tracking data to third-party advertising networks, analytics services, and/or social media companies for the purposes of providing personalized content, advertising, and social media features, as well as enabling the sharing or sale of his personal information).

114.   In adjusting the available toggle switches to opt out of or reject all such cookies, Plaintiff Gioffre gave Defendant notice that he did not consent to the use or placement of cookies and tracking technologies while browsing the Jeep Website. Further, Plaintiff Gioffre specifically rejected, based on Defendant's representations, Performance, Functional, Targeting, and Social Media cookies.  In reliance on these representations and promises, only then did Plaintiff Gioffre continue browsing the Jeep Website.

115.   Even before the popup cookie consent banner or Cookie Settings window appeared on the screen, Defendant nonetheless caused cookies and tracking technologies,

- 52 -

CLASS ACTION COMPLAINT

including those used for personalized content, advertising, and social media features, to be placed on Plaintiff Gioffre's device and/or transmitted to the Third Parties along with user data, without Plaintiff Gioffre's knowledge. Accordingly, the popup cookie consent banner's and Cookie Settings window's representations to Plaintiff Gioffre that he could reject the use and/or placement of all non-essential cookies and tracking technologies while he browsed the Jeep Website were false. Contrary to what Defendant made Plaintiff Gioffre believe, he did not have a choice about whether third-party cookies would be placed on his device and/or transmitted to the Third Parties along with his user data; rather, Defendant had already caused that to happen.

116.    Then, as Plaintiff Gioffre continued to browse the Jeep Website in reliance on the promises Defendant made in the cookie consent banner and Cookies Settings window, and despite Plaintiff Gioffre's clear rejection of the use and/or placement of such cookies and tracking technologies, Defendant nonetheless continued to cause the placement and/or transmission of cookies along with user data, including those involved in providing personalized content, advertising, and social media features from the Third Parties on his device. In doing so, Defendant permitted the Third Parties to track and collect Plaintiff Gioffre's Private Communications as Plaintiff Gioffre browsed the Jeep Website.

117.    Defendant's representations that consumers could opt out of or reject all non-essential categories of cookies, including Performance, Functional, Targeting, and Social Media cookies, while Plaintiff Gioffre and users browsed the Jeep Website, were untrue. Had Plaintiff Gioffre known this fact, he would not have used the Jeep Website. Moreover, Plaintiff Gioffre reviewed the popup cookie consent banner and Cookie Settings window prior to using the Jeep Website. Had Defendant disclosed that it would continue to cause cookies and tracking technologies to be stored on consumers' devices even after they choose to opt-out of or reject all non-essential cookies, Plaintiff Gioffre would have noticed it and would not have used the Website or, at a minimum, he would have interacted with the Jeep Website differently.

118.    Plaintiff Gioffre continues to desire to browse content featured on the Websites. Plaintiff Gioffre would like to browse websites that do not misrepresent that users can opt out of or reject all non-essential cookies and tracking technologies. If the Websites were programmed

CLASS ACTION COMPLAINT

to honor users' requests to reject all non-essential cookies and tracking technologies, Plaintiff Gioffre would likely browse the Websites again in the future, but will not do so until then. Plaintiff Gioffre regularly visits websites that feature content similar to that of the Websites. Because Plaintiff Gioffre does not know how the Websites are programmed, which can change over time, and because he does not have the technical knowledge necessary to test whether the Websites honor users' requests to opt out of or reject all non-essential cookies and tracking technologies, Plaintiff Gioffre will be unable to rely on Defendant's representations when browsing the Websites in the future absent an injunction that prohibits Defendant from making misrepresentations on the Websites. The only way to determine what network traffic is sent to third parties when visiting a website is to use a specialized tool such as Chrome Developer Tools. As the name suggests, such tools are designed for use by "developers" (i.e., software developers), whose specialized training enables them to analyze the data underlying the HTTP traffic to determine what data, if any, is being sent to whom. Plaintiff Gioffre is not a software developer and has not received training with respect to HTTP network calls.

**Terry Dean Meyers**

119.    Plaintiff Meyers visited each of the Websites to seek and obtain information about Defendant's products, while located in California, on one or more occasions during the last four years.

120.    Plaintiff Meyers' visits to the Websites were consistent with a typical Website user's visits seeking information about Defendant's products. Specifically, Plaintiff Meyers is not a consumer advocate, a "tester," or a compliance auditor that visited the Website to test or evaluate Defendant's privacy practices.

121.    Plaintiff Meyers regularly visited the Jeep Website to research vehicle models, configurations, and features. Plaintiff Meyers also used interactive features on the Jeep Website, including the "Build Your Own" vehicle configurator and the "Find a Dealer" tool, and browsed merchandise, apparel, and parts offerings available through the Website.

122.    Plaintiff Meyers visited the Dodge Website to research Dodge Challenger vehicles and related products. During those visits, Plaintiff Meyers viewed information regarding

vehicle models, horsepower, engine specifications, and available options for different model years, and used features such as the "Shop Online" functionality to explore available vehicle configurations. Plaintiff Meyers also browsed merchandise and apparel offerings, including hats and shirts, available through the Dodge Website.

123. Plaintiff Meyers also visited the Chrysler Website to research Chrysler vehicle models and options, including the Chrysler 300. Plaintiff Meyers further visited the Ram Website to research truck models and towing-related capabilities. Plaintiff Meyers visited the Fiat Website to review vehicle models, available features, and dealership locations through the Website's "Find a Dealer" functionality. Plaintiff Meyers visited the Alfa Romeo Website to browse vehicle offerings and related information. Plaintiff Meyers also regularly visited the Mopar Website to research vehicle parts, availability, and pricing information. Plaintiff Meyers additionally visited the Stellantis Fleet Website to review financing offers and related vehicle purchasing information prior to vehicle purchases.

124. When Plaintiff Meyers visited the Websites, each Website immediately detected that he was a visitor in California and presented him with Defendant's popup cookie consent banner, which provided the option to select the "Cookie Settings" link. Plaintiff Meyers viewed Defendant's representation on the popup cookie consent banner that, "We use first and third-party cookies to optimize site functionality, enhance the user experience, personalize content and ads, and provide social media and other third-party features."

125. Desiring to opt out of or reject cookies on the Websites, Plaintiff Meyers clicked or selected the "Cookie Settings" link. The Websites then presented him with the "Cookie Settings" window. There, Plaintiff Meyers saw Defendant's additional representations that, on the Dodge Website, "The California Consumer Privacy Act (CCPA) gives California residents the right to opt out of the 'sale' of their personal information, which as defined under the CCPA may include disclosures via certain third-party cookies and tags on our Site. You can choose to opt out of all third-party cookies on our Site, other than those that are 'necessary', by turning off the category 'Sales of Personal Information'[.]" In navigating to the "Opt-Out of Cookies" tab, Plaintiff Meyers also saw Defendant's further representation, on the Dodge Website, that, "Users

of our Site can choose to opt out of all third-party cookies on our Site, other than those that are 'necessary', by using this toggle switch to turn off such cookies[.]" Plaintiff Meyers saw the referenced toggle switch, and also that he could opt-out of or reject all categories of cookies, including Performance, Functional, Targeting, and Social Media cookies, other than those "Essential" for the Website to function.[13]

126.    Plaintiff Meyers adjusted the toggle switch to "Opt-Out of Cookies" in each of the Websites' Cookie Settings windows to opt out of or reject all categories of cookies in use on the Website, including all Performance, Functional, Targeting, and Social Media cookies, except those "Essential" for the Website to function. Plaintiff Meyers believed that adjusting the toggle switches found on the Cookie Settings window on the Websites would allow him to opt out of, decline, and/or reject all non-essential cookies and other tracking technologies (inclusive of those cookies that cause the disclosure of tracking data to third-party advertising networks, analytics services, and/or social media companies for the purposes of providing personalized content, advertising, and social media features, as well as enabling the sharing or sale of his personal information).

127.    In adjusting the available toggle switches to opt out of or reject all such cookies, Plaintiff Meyers gave Defendant notice that he did not consent to the use or placement of cookies and tracking technologies while browsing the Websites. Further, Plaintiff Meyers specifically rejected, based on Defendant's representations, Performance, Functional, Targeting, and Social Media cookies. In reliance on these representations and promises, only then did Plaintiff Meyers continue browsing the Websites.

128.    Even before the popup cookie consent banner or Cookie Settings window appeared on the screen, Defendant nonetheless caused cookies and tracking technologies, including those used for personalized content, advertising, and social media features, to be placed on Plaintiff Meyers' device and/or transmitted to the Third Parties along with user data, without Plaintiff Meyers' knowledge. Accordingly, the popup cookie consent banner's and

---

[13] Defendant made similar representations in the Cookie Settings windows of each of the Websites.

CLASS ACTION COMPLAINT

Cookie Settings window's representations to Plaintiff Meyers that he could reject the use and/or placement of all non-essential cookies and tracking technologies while he browsed the Websites were false. Contrary to what Defendant made Plaintiff Meyers believe, he did not have a choice about whether third-party cookies would be placed on his device and/or transmitted to the Third Parties along with his user data; rather, Defendant had already caused that to happen.

129. Then, as Plaintiff Meyers continued to browse the Websites in reliance on the promises Defendant made in the cookie consent banner and Cookies Settings window, and despite Plaintiff Meyers' clear rejection of the use and/or placement of such cookies and tracking technologies, Defendant nonetheless continued to cause the placement and/or transmission of cookies along with user data, including those involved in providing personalized content, advertising, and social media features from the Third Parties on his device. In doing so, Defendant permitted the Third Parties to track and collect Plaintiff Meyers' Private Communications as Plaintiff Meyers browsed the Websites.

130. Defendant's representations that consumers could opt out of or reject all non-essential categories of cookies, including Performance, Functional, Targeting, and Social Media cookies, while Plaintiff Meyers and users browsed the Websites, were untrue. Had Plaintiff Meyers known this fact, he would not have used the Websites. Moreover, Plaintiff Meyers reviewed the popup cookie consent banner and Cookie Settings window prior to using the Websites. Had Defendant disclosed that it would continue to cause cookies and tracking technologies to be stored on consumers' devices even after they choose to opt-out of or reject all non-essential cookies, Plaintiff Meyers would have noticed it and would not have used the Website or, at a minimum, he would have interacted with the Websites differently.

131. Plaintiff Meyers continues to desire to browse content featured on the Websites. Plaintiff Meyers would like to browse websites that do not misrepresent that users can opt out of or reject all non-essential cookies and tracking technologies. If the Websites were programmed to honor users' requests to reject all non-essential cookies and tracking technologies, Plaintiff Meyers would likely browse the Websites again in the future, but will not do so until then. Plaintiff Meyers regularly visits websites that feature content similar to that of

CLASS ACTION COMPLAINT

the Websites. Because Plaintiff Meyers does not know how the Websites are programmed, which can change over time, and because he does not have the technical knowledge necessary to test whether the Websites honor users' requests to opt out of or reject all non-essential cookies and tracking technologies, Plaintiff Meyers will be unable to rely on Defendant's representations when browsing the Websites in the future absent an injunction that prohibits Defendant from making misrepresentations on the Websites. The only way to determine what network traffic is sent to third parties when visiting a website is to use a specialized tool such as Chrome Developer Tools. As the name suggests, such tools are designed for use by "developers" (i.e., software developers), whose specialized training enables them to analyze the data underlying the HTTP traffic to determine what data, if any, is being sent to whom. Plaintiff Meyers is not a software developer and has not received training with respect to HTTP network calls.

## CLASS ALLEGATIONS

132.    Plaintiffs bring this Class Action Complaint on behalf of themselves and a proposed class of similarly situated persons, pursuant to Rules 23(b)(2) and (b)(3) of the Federal Rules of Civil Procedure. Plaintiffs seek to represent the following group of similarly situated persons, defined as follows:

> **Class**: All persons who, while in the State of California, browsed any of Defendant's Websites after clicking or selecting the "Cookies Settings" link in the popup cookies consent banner and either adjusting the "Opt-out of Cookies" toggle switch to opt out of all third party non-essential cookies or adjusting each individual toggle switch to opt out of all non-essential cookies in the Cookies Settings window.

133.    This action has been brought and may properly be maintained as a class action against Defendant because there is a well-defined community of interest in the litigation and the proposed class is easily ascertainable.

134.    **Numerosity:** Plaintiffs do not know the exact size of the Class, but they estimate that it is composed of more than 100 persons. The persons in the Class are so numerous that the joinder of all such persons is impracticable and the disposition of their claims in a class action rather than in individual actions will benefit the parties and the courts.

135.  **Common Questions Predominate:** This action involves common questions of law and fact to the Class because each class member's claim derives from the same unlawful conduct that led them to believe that Defendant would not cause third-party cookies to be placed on their browsers and devices and/or transmitted to third parties along with user data, after Class members chose to opt out of all non-essential cookies and tracking technologies on the Websites, nor would Defendant permit third parties to track and collect Class members' Private Communications as Class members browsed the Websites.

136.  The common questions of law and fact predominate over individual questions, as proof of a common or single set of facts will establish the right of each member of the Class to recover. The questions of law and fact common to the Class are:

a.  Whether Defendant's actions violate California laws invoked herein; and

b.  Whether Plaintiffs and Class members are entitled to damages, restitution, injunctive and other equitable relief, reasonable attorneys' fees, prejudgment interest and costs of this suit.

137.  **Typicality:** Plaintiffs' claims are typical of the claims of the other members of the Class because, among other things, Plaintiffs, like the other Class members, visited the Websites, opted out of or rejected non-essential cookies, and had his confidential Private Communications intercepted by the Third Parties.

138.  **Adequacy of Representation:** Plaintiffs will fairly and adequately protect the interests of all Class members because it is in his best interests to prosecute the claims alleged herein to obtain full compensation due to them for the unfair and illegal conduct of which they complain. Plaintiffs also have no interests in conflict with, or antagonistic to, the interests of Class members. Plaintiffs have retained highly competent and experienced class action attorneys to represent their interests and those of the Class. By prevailing on their claims, Plaintiffs will establish Defendant's liability to all Class members. Plaintiffs and their counsel have the necessary financial resources to adequately and vigorously litigate this class action, and Plaintiffs and counsel are aware of their fiduciary responsibilities to the Class members and are determined

to diligently discharge those duties by vigorously seeking the maximum possible recovery for Class members.

139.    **Superiority:** There is no plain, speedy, or adequate remedy other than by maintenance of this class action. The prosecution of individual remedies by members of the Class will tend to establish inconsistent standards of conduct for Defendant and result in the impairment of Class members' rights and the disposition of their interests through actions to which they were not parties. Class action treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would engender. Furthermore, as the damages suffered by each individual member of the Class may be relatively small, the expenses and burden of individual litigation would make it difficult or impossible for individual members of the class to redress the wrongs done to them, while an important public interest will be served by addressing the matter as a class action. Plaintiffs are unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

## CAUSES OF ACTION

### First Cause of Action: Invasion of Privacy

140.    Plaintiffs reallege and incorporate the paragraphs of this Complaint as if set forth herein.

141.    To plead an invasion of privacy claim, Plaintiffs must show an invasion of (i) a legally protected privacy interest; (ii) where Plaintiffs had a reasonable expectation of privacy in the circumstances; and (iii) conduct by Defendant constituting a serious invasion of privacy.

142.    Defendant has intruded upon the following legally protected privacy interests of Plaintiffs and Class members: (i) the California Invasion of Privacy Act, as alleged herein; (ii) the California Constitution, which guarantees Californians the right to privacy; (iii) the California Wiretap Acts as alleged herein; (iv) Cal. Penal Code § 484(a), which prohibits the knowing theft or defrauding of property "by any false or fraudulent representation or pretense;" and (v) Plaintiffs' and Class members' Fourth Amendment right to privacy.

CLASS ACTION COMPLAINT

143. Plaintiffs and Class members had a reasonable expectation of privacy under the circumstances, as Defendant affirmatively promised users they could opt out of or reject all non-essential cookies and tracking technologies before proceeding to browse the Websites. Plaintiffs and other Class members directed their electronic devices to access the Websites and, when presented with the popup cookies consent banner and Cookies Settings window on the Websites, Plaintiffs and Class members opted out of or rejected all non-essential cookies and reasonably expected that their choice to opt out of or reject all non-essential cookies and tracking technologies would be honored. That is, they reasonably believed that Defendant would not permit the Third Parties to store and send cookies and/or use other such tracking technologies on their devices while they browsed the Websites. Plaintiffs and Class members also reasonably expected that, if they opted out of or rejected such cookies and/or tracking technologies, Defendant would not permit the Third Parties to track and collect Plaintiffs' and Class members' Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, on the Websites.

144. Such information is "personal information" under California law, which defines personal information as including "Internet or other electronic network activity information," such as "browsing history, search history, and information regarding a consumer's interaction with an internet website, application, or advertisement." Cal. Civ. Code § 1798.140.

145. Defendant, in violation of Plaintiffs' and other Class members' reasonable expectation of privacy and without their consent, permits the Third Parties to use cookies and other tracking technologies to collect, track, and compile users' Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data—including whether a user is located in California. The data that Defendant allowed third parties to collect enables the Third Parties to (and they in fact do), *inter alia*, create consumer profiles containing detailed

information about a consumer's behavior, preferences, and demographics; create audience segments based on shared traits (such as Millennials, Californians, tech enthusiasts, etc.); and perform targeted advertising and marketing analytics. Further, the Third Parties share user data and/or the user profiles to unknown parties to further their financial gain. The consumer profiles are and can be used to further invade Plaintiffs' and users' privacy, by allowing third parties to learn intimate details of their lives, and target them for advertising and other purposes, as described herein, thereby harming them through the abrogation of their autonomy and their ability to control dissemination and use of information about them.

146.    Defendant's actions constituted a serious invasion of privacy in that it invaded a zone of privacy protected by the Fourth Amendment (i.e., one's personal communications), and violated criminal laws on wiretapping and invasion of privacy. These acts constitute an egregious breach of social norms that is highly offensive.

147.    Defendant's intrusion into Plaintiffs' privacy was also highly offensive to a reasonable person.

148.    Defendant lacked a legitimate business interest in causing the placement and/or transmission of third-party cookies along with user data that allowed the Third Parties to track, intercept, receive, and collect Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, without their consent.

149.    Plaintiffs and Class members have been damaged by Defendant's invasion of their privacy and are entitled to just compensation, including monetary damages.

150.    Plaintiffs and Class members seek appropriate relief for that injury, including but not limited to, damages that will compensate them for the harm to their privacy interests as well as disgorgement of profits made by Defendant as a result of its intrusions upon Plaintiffs' and Class members' privacy.

151.    Plaintiffs and Class members seek punitive damages because Defendant's actions—which were malicious, oppressive, willful—were calculated to injure Plaintiffs and

Class members and made in conscious disregard of Plaintiffs' and Class members' rights and Plaintiffs' and Class members' choice to opt out of or reject the Websites' use of non-essential cookies. Punitive damages are warranted to deter Defendant from engaging in future misconduct.

**Second Cause of Action: Intrusion Upon Seclusion**

152. Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

153. To assert a claim for intrusion upon seclusion, Plaintiffs must plead (i) that Defendant intentionally intruded into a place, conversation, or matter as to which Plaintiffs had a reasonable expectation of privacy; and (ii) that the intrusion was highly offensive to a reasonable person.

154. By permitting third-party cookies to be stored on consumers' devices without consent, which caused the Third Parties to track and collect Plaintiffs' and Class members' Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, in violation of Defendant's representations otherwise in the popup cookie consent banner and Cookie Settings window, Defendant intentionally intruded upon the solitude or seclusion of users of the Websites. Defendant effectively placed the Third Parties in the middle of communications to which they were not invited, welcomed, or authorized.

155. The Third Parties' tracking and collecting of Plaintiffs' and Class member's Private Communications on the Websites using third-party cookies that Defendant caused to be stored on users' devices—and to be transmitted to the Third Parties—was not authorized by Plaintiffs and Class members, and, in fact, the Websites' users specifically chose to opt out of or reject all non-essential cookies.

156. Plaintiffs and the Class members had an objectively reasonable expectation of privacy surrounding their Private Communications on the Websites based on Defendant's promise that users could opt out of or reject all non-essential cookies, as well as state criminal and civil laws designed to protect individual privacy.

157.    Defendant's intentional intrusion into Plaintiffs' and other users' Private Communications would be highly offensive to a reasonable person given that Defendant represented that the Websites' users could opt out of or reject all non-essential cookies when, in fact, Defendant caused such third-party cookies to be stored on consumers' devices and browsers, and to be transmitted to third parties, even when consumers opted out of or rejected all such cookies. Indeed, Plaintiffs and Class members reasonably expected, based on Defendant's false representations, that when they opted out of or rejected all non-essential cookies and tracking technologies, Defendant would not cause such third-party cookies to be stored on their devices or permit the Third Parties to obtain their Private Communications on the Websites, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data—including whether a user is located in California.

158.    Defendant's conduct was intentional and intruded on Plaintiffs' and users' Private Communications on the Websites.

159.    Plaintiffs and Class members have been damaged by Defendant's invasion of their privacy and are entitled to just compensation, including monetary damages.

160.    Plaintiffs and Class members seeks appropriate relief for that injury, including but not limited to, damages that will compensate them for the harm to their privacy interests as well as disgorgement of profits made by Defendant as a result of its intrusions upon Plaintiffs' and Class members' privacy.

161.    Plaintiffs and Class members seek punitive damages because Defendant's actions—which were malicious, oppressive, willful—were calculated to injure Plaintiffs and Class members and made in conscious disregard of Plaintiffs' and Class members' rights and Plaintiffs' and Class members' election to click or select the Website's "Cookie Settings" link in the cookie consent banner and adjust the toggle switch/es to "Opt-Out of Cookies" in the Website's Cookie Settings window. Punitive damages are warranted to deter Defendant from engaging in future misconduct.

**Third Cause of Action**: **Wiretapping in Violation of the California Invasion of Privacy Act (California Penal Code § 631)**

162.    Plaintiff reallege and incorporate by reference all paragraphs alleged herein.

163.    California Penal Code § 631(a) provides, in pertinent part:

"Any person who, by means of any machine, instrument, or contrivance, or in any other manner . . . willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state; or who uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained, or who aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section, is punishable by a fine not exceeding two thousand five hundred dollars . . . ."

164.    The California Supreme Court has repeatedly stated an "express objective" of CIPA is to "protect a person placing or receiving a call from a situation where the person on the other end of the line permits an outsider to tap his telephone or listen in on the call." *Ribas v. Clark*, 38 Cal. 3d 355, 364 (1985) (emphasis added).

165.    Further, as the California Supreme Court has held, in explaining the legislative purpose behind CIPA:

While one who imparts private information risks the betrayal of his confidence by the other party, a substantial distinction has been recognized between the secondhand repetition of the contents of a conversation and *its simultaneous dissemination to an unannounced second auditor, whether that auditor be a person or mechanical device.*

As one commentator has noted, such secret monitoring denies the speaker an important aspect of privacy of communication— the right to control the nature and extent of the firsthand dissemination of his statements.

*Ribas*, 38 Cal. 3d at 360-61 (emphasis supplied; internal citations omitted).

166.    CIPA § 631(a) imposes liability for "distinct and mutually independent patterns of conduct." *Tavernetti v. Superior Ct.*, 22 Cal. 3d 187, 192-93 (1978). Thus, to establish liability under § 631(a), Plaintiffs need only establish that Defendant, "by means of any machine, instrument, contrivance, or in any other manner," did ***any*** of the following:

[i] Intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system;

- 65 -

[ii] Willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line or cable or is being sent from or received at any place within this state;

[iii] Uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained

Cal. Penal Code § 631(a).

167.    CIPA § 631(a) also penalizes those who [iv] "aid[], agree[] with, employ[], or conspire[] with any person" who conducts the aforementioned wiretapping, or those who "permit" the wiretapping.

168.    Defendant is a "person" within the meaning of California Penal Code § 631.

169.    Section 631(a) is not limited to phone lines, but also applies to "new technologies" such as computers, the Internet, and email. *See Matera v. Google Inc.*, 2016 WL 8200619, at *21 (N.D. Cal. Aug. 12, 2016) (CIPA applies to "new technologies" and must be construed broadly to effectuate its remedial purpose of protecting privacy); *see also Bradley v. Google, Inc.*, 2006 WL 3798134, at *5–6 (N.D. Cal. Dec. 22, 2006) (CIPA governs "electronic communications"); *Javier v. Assurance IQ, LLC*, 2022 WL 1744107, at *1 (9th Cir. May 31, 2022) ("Though written in terms of wiretapping, Section 631(a) applies to Internet communications.").

170.    The Third Parties' cookies—as well as the software code of the Third Parties responsible for placing the cookies and transmitting data from user devices to the Third Parties—constitute "machine[s], instrument[s], or contrivance[s]" under the CIPA (and, even if they do not, Defendant's deliberate and purposeful scheme that facilitated the interceptions falls under the broad statutory catch-all category of "any other manner").

171.    Each of the Third Parties is a "separate legal entity that offers [a] 'software-as-a-service' and not merely a passive device." *Saleh v. Nike, Inc.*, 562 F. Supp. 3d 503, 520 (C.D. Cal. 2021). Further, the Third Parties had the capability to use the wiretapped information for their own purposes and, as alleged above, they did in fact use the wiretapped information for their own business purposes. Accordingly, the Third Parties were third parties to any

CLASS ACTION COMPLAINT

communication between Plaintiffs and Class members, on the one hand, and Defendant, on the other. *Id.* at 521; *see also Javier v. Assurance IQ, LLC*, 649 F. Supp. 3d 891, 900 (N.D. Cal. 2023).

172. Under § 631(a), Defendant must show it had the consent of all parties to a communication.

173. At all relevant times, by their cookies and corresponding software code, the Third Parties willfully and without the consent of all parties to the communication, or in any unauthorized manner, read, attempted to read, and/or learned the contents or meaning of electronic communications of Plaintiffs and Class members, on the one hand, and Defendant, on the other, while the electronic communications were in transit or were being sent from or received at any place within California.

174. The Private Communications of Plaintiffs and Class members, on the one hand, and Defendant, on the other, that the Third Parties automatically intercepted directly communicates the Website user's affirmative decisions, actions, choices, preferences, and activities, which constitute the "contents" of electronic communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data—including whether a user is located in California.

175. At all relevant times, the Third Parties used or attempted to use the Private Communications automatically intercepted by their cookie tracking technologies for their own purposes.

176. Plaintiffs and Class members did not provide their prior consent to the Third Parties' intentional access, interception, reading, learning, recording, collection, and usage of Plaintiffs' and Class members' electronic communications. Nor did Plaintiffs and Class members provide their prior consent to Defendant aiding, agreeing with, employing, permitting, or otherwise enabling the Third Parties' conduct. On the contrary, Plaintiffs and Class members expressly declined to allow the Third Parties' cookies and tracking technologies to access,

intercept, read, learn, record, collect, and use Plaintiffs' and Class members' electronic communications by choosing to opt out of or reject all non-essential cookies in the Cookie Settings window.

177. The wiretapping of Plaintiffs and Class members occurred in California, where Plaintiffs and Class members accessed the Website and where the Third Parties—as caused by Defendant—routed Plaintiffs' and Class members' electronic communications to Third Parties' servers. Among other things, the cookies, as well as the software code responsible for placing the cookies and transmitting them and other Private Communications to the Third Parties, resided on Plaintiffs' California-located device. In particular, the user's California-based device, after downloading the software code from the Third Parties' servers, (i) stored the code onto the user's disk; (ii) converted the code into machine-executable format; and (iii) executed the code, causing the transmission of data (including cookie data) to and from the Third Parties.

178. Plaintiffs and Class members have suffered loss by reason of these violations, including, but not limited to, (i) violation of their right to privacy, (ii) loss of value in their Private Communications, (iii) damage to and loss of Plaintiffs' and Class members' property right to control the dissemination and use of their Private Communications, and (iv) loss of their Private Communications to the Third Parties with no consent.

179. Pursuant to California Penal Code § 637.2, Plaintiffs and Class members have been injured by the violations of California Penal Code § 631, and each seeks statutory damages of the greater of $5,000, or three times the amount of actual damages, for each of Defendant's violations of CIPA § 631(a), as well as injunctive relief.

180. Unless enjoined, Defendant will continue to commit the illegal acts alleged herein including, but not limited to, permitting third parties to access, intercept, read, learn, record, collect, and use Plaintiffs' and Class members' electronic Private Communications with Defendant. Plaintiffs, Class members, and the general public continue to be at risk because Plaintiffs, Class members, and the general public frequently use the internet to search for information and content related to automobiles. Plaintiffs, Class members, and the general public continue to desire to use the internet for that purpose. Plaintiffs, Class members, and the general

CLASS ACTION COMPLAINT

public have no practical way to know if their request to opt out of or reject all non-essential cookies and tracking technologies will be honored and/or whether Defendant will permit third parties to access, intercept, read, learn, record, collect, and use Plaintiffs' and Class members' electronic Private Communications with Defendant. Further, Defendant has already permitted the Third Parties to access, intercept, read, learn, record, collect, and use Plaintiffs' and Class members' electronic Private Communications with Defendant and will continue to do so unless and until enjoined.

**Fourth Cause of Action: Use of a Pen Register in Violation of the California Invasion of Privacy Act (California Penal Code § 638.51)**

181.    Plaintiff reallege and incorporates by reference all paragraphs alleged herein.

182.    The California Invasion of Privacy Act, codified at Cal. Penal Code §§ 630 to 638, includes the following statement of purpose:

> The Legislature hereby declares that advances in science and technology have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications and that the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society.

183.    California Penal Code Section 638.51(a) proscribes any "person" from "install[ing] or us[ing] a pen register or a trap and trace device without first obtaining a court order."

184.    A "pen register" is a "a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication." Cal. Penal Code § 638.50(b).

185.    The Third Parties' cookies and the corresponding software code installed by Defendant on its Website are each "pen registers" because they are "device[s] or process[es]" that "capture[d]" the "routing, addressing, or signaling information"—including, the IP address and user-agent information—from the electronic communications transmitted by Plaintiffs' and the Class's computers or devices. Cal. Penal Code § 638.50(b).

CLASS ACTION COMPLAINT

186. At all relevant times, Defendant caused pen registers (e.g., the Third Party software code and cookies) to be placed on Plaintiffs' and Class members' browsers and devices. This software code established and maintained network connections between the users' devices and the Third Parties, and also caused cookies, user data and metadata, and addressing and networking information (including, without limitation, destination IP addresses, port numbers, protocol-level metadata, HTTP request header metadata, and and user-agent information), to be transmitted to the Third Parties. *See Greenley v. Kochava,* 2023 WL 4833466, at *15-16 (S.D. Cal. July 27, 2023); *Shah v. Fandom, Inc.*, 2024 U.S. Dist. LEXIS 193032, at *5-11 (N.D. Cal. Oct. 21, 2024).

187. Some of the information collected by the Third Parties' cookies and the corresponding software, including IP addresses and user-agent information, does not constitute the content of Plaintiffs' and the Class members' electronic communications with the Websites. *In re Zynga Privacy Litig.*, 750 F.3d 1098, 1008 (9th Cir. 2014). ("IP addresses constitute addressing information and do not necessarily reveal any more about the underlying contents of communication…") (cleaned up).

188. Plaintiffs and Class members did not provide their prior consent to Defendant's use of third-party cookies and the corresponding software. On the contrary, Plaintiffs and the Class members informed Defendant that they did not consent to the Websites' use of third-party cookies by adjusting available settings and/or toggle switches to opt out of or reject all non-essential cookies on the Websites.

189. Defendant did not obtain a court order to install or use the third-party cookies and corresponding software to track and collect Plaintiffs' and Class member's IP addresses and user-agent information.

190. As a direct and proximate result of Defendant's conduct, Plaintiffs and Class members suffered losses and were damaged in an amount to be determined at trial.

191. Pursuant to Penal Code § 637.2(a)(1), Plaintiffs and Class members are also entitled to statutory damages of $5,000 for each of Defendant's violations of § 638.51(a).

**Fifth Cause of Action: Common Law Fraud, Deceit and/or Misrepresentation**

192.    Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

193.    Defendant fraudulently and deceptively informed Plaintiffs and Class members that they could opt out of or reject all categories of non-essential cookies in use on the Websites, including all Performance, Functional, Targeting, and Social Media cookies.

194.    However, despite Defendant's representations otherwise, Defendant caused third-party cookies and software code to be stored on consumers' devices, and to be transmitted to the Third Parties alongside Private Communications, even after users adjusted settings and/or toggle switches on the Cookie Settings window to opt out of or reject all non-essential cookies on the Websites. These cookies and corresponding software code allowed the Third Parties to access, intercept, read, learn, record, collect, and use Plaintiffs' and Class members' Private Communications, even when consumers had previously chosen to opt out of or reject all such cookies.

195.    These misrepresentations and omissions were known exclusively to, and actively concealed by Defendant, not reasonably known to Plaintiffs and Class members, and material at the time they were made. Defendant knew, or should have known, how the Websites functioned, including the Third Parties' resources it installed on the Websites and the third-party cookies in use on the Websites, through testing the Websites, evaluating its performance metrics by means of its accounts with the Third Parties, or otherwise, and knew, or should have known, that the Websites' programming allowed the third-party cookies to be placed on users'—including Plaintiff's—browsers and devices and/or transmitted to the Third Parties along with users' Private Communications even after users attempted to opt out of or reject all non-essential cookies, which Defendant promised its users they could do. Defendant's misrepresentations and omissions concerned material facts that were essential to the analysis undertaken by Plaintiffs and Class members as to whether to use the Websites. In misleading Plaintiffs and Class members and not so informing them, Defendant breached its duty to Plaintiffs and Class members. Defendant also gained financially from, and as a result of, its breach.

CLASS ACTION COMPLAINT

196.    Plaintiffs and Class members relied to their detriment on Defendant's misrepresentations and fraudulent omissions.

197.    Plaintiffs and Class members have suffered an injury-in-fact, including the loss of money and/or property, as a result of Defendant's unfair, deceptive, and/or unlawful practices, including the unauthorized interception of their Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, which have value as demonstrated by the use and sale of consumers' browsing activity, as alleged above. Plaintiffs and Class members have also suffered harm in the form of diminution of the value of their private and personally identifiable information and communications.

198.    Defendant's actions caused damage to and loss of Plaintiffs' and Class members' property right to control the dissemination and use of their personal information and communications.

199.    Defendant's representation that consumers could opt out of or reject all non-essential cookies (including "third-party cookies to optimize site functionality, enhance the user experience, personalize content and ads, and provide social media and other third-party features") if they adjusted settings and/or toggle switches to do so on the Cookie Settings window was untrue. Again, had Plaintiffs and Class members known these facts, they would not have used the Websites. Moreover, Plaintiffs and Class members reviewed the popup cookie consent banner and Cookie Settings window prior to their interactions with the Websites. Had Defendant disclosed that it caused third-party non-essential cookies to be stored on visitors' devices that are related to personalization, advertising, and social media, and/or share information with the Third Parties, even after they choose to opt out of or reject all such non-essential cookies, Plaintiffs and Class members would have noticed it and would not have interacted with the Websites.

200.    By and through such fraud, deceit, misrepresentations and/or omissions, Defendant intended to induce Plaintiffs and Class members to alter their positions to their

- 72 -

detriment. Specifically, Defendant fraudulently and deceptively induced Plaintiffs and Class members to, without limitation, use the Websites under the mistaken belief that Defendant would not permit third parties to obtain users' Private Communications when consumers chose to opt out of or reject all non-essential cookies. As a result, Plaintiffs and the Class provided more personal data than they would have otherwise.

201. Plaintiffs and Class members justifiably and reasonably relied on Defendant's misrepresentations and omissions, and, accordingly, were damaged by Defendant's conduct.

202. As a direct and proximate result of Defendant's misrepresentations and/or omissions, Plaintiffs and Class members have suffered damages, as alleged above, and are entitled to just compensation, including monetary damages.

203. Plaintiffs and Class members seek punitive damages because Defendant's actions—which were malicious, oppressive, willful—were calculated to injure Plaintiffs and Class members and made in conscious disregard of Plaintiffs' and Class members' rights and Plaintiffs' and Class members' decision to click or select the "Cookie Settings" link in the cookie consent banner and adjust the toggle switch/es to "Opt-Out of Cookies" in the Website's Cookie Settings window. Punitive damages are warranted to deter Defendant from engaging in future misconduct.

### Sixth Cause of Action: Unjust Enrichment

204. Plaintiff reallege and incorporate by reference all paragraphs alleged herein.

205. Defendant created and implemented a scheme to increase its own profits through a pervasive pattern of false statements and fraudulent omissions.

206. Defendant was unjustly enriched as a result of its wrongful conduct, including through its misrepresentation that users could opt out of or reject all non-essential cookies and by permitting the Third Parties to store and transmit cookies on Plaintiffs' and Class members' devices and browsers, which permitted the Third Parties to track and collect users' Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device

information, referring URLs, session information, user identifiers, and/or geolocation data, even after Class members opted out of or rejected such cookies.

207. Plaintiffs and Class members' Private Communications have conferred an economic benefit on Defendant.

208. Defendant has been unjustly enriched at the expense of Plaintiffs and Class members, and Defendant has unjustly retained the benefits of its unlawful and wrongful conduct.

209. Defendant appreciated, recognized, and chose to accept the monetary benefits that Plaintiffs and Class members conferred onto Defendant at their detriment. These benefits were the expected result of Defendant acting in its pecuniary interest at the expense of Plaintiffs and Class members.

210. It would be unjust for Defendant to retain the value of Plaintiffs' and Class members' property and any profits earned thereon.

211. There is no justification for Defendant's enrichment. It would be inequitable, unconscionable, and unjust for Defendant to be permitted to retain these benefits because the benefits were procured as a result of its wrongful conduct.

212. Plaintiffs and Class members are entitled to restitution of the benefits Defendant unjustly retained and/or any amounts necessary to return Plaintiffs and Class members to the position they occupied prior to having their Private Communications tracked and collected by the Third Parties.

213. Plaintiffs plead this claim separately, as well as in the alternative, to their other claims, as without such claims Plaintiffs would have no adequate legal remedy.

## **PRAYER FOR RELIEF**

**WHEREFORE**, reserving all rights, Plaintiffs, on behalf of themselves and the Class members, respectfully requests judgment against Defendant as follows:

A. Certification of the proposed Class, including appointment of Plaintiffs' counsel as class counsel;

CLASS ACTION COMPLAINT

B.     An award of compensatory damages, including statutory damages where available, to Plaintiffs and Class members against Defendant for all damages sustained as a result of Defendant's wrongdoing, including both pre- and post-judgment interest thereon;

C.     An award of punitive damages;

D.     An award of nominal damages;

E.     An order for full restitution;

F.     An order requiring Defendant to disgorge revenues and profits wrongfully obtained;

G.     An order temporarily and permanently enjoining Defendant from continuing the unlawful, deceptive, fraudulent, and unfair business practices alleged in this Complaint;

H.     For reasonable attorneys' fees and the costs of suit incurred; and

I.     For such further relief as may be just and proper.

Dated: May 1, 2026

**GUTRIDE SAFIER LLP**

*/s/ Seth A. Safier/s/*
Seth A. Safier (State Bar No. 197427)
  seth@gutridesafier.com
Marie A. McCrary (State Bar No. 262670)
  marie@gutridesafier.com
Todd Kennedy (State Bar No. 250267)
  todd@gutridesafier.com
100 Pine Street, Suite 1250
San Francisco, CA 94111
Telephone: (415) 639-9090
Facsimile:  (415) 449-6469

*Attorneys for Plaintiffs*

CLASS ACTION COMPLAINT

# EXHIBIT A

**GUTRIDE SAFIER LLP**
Seth A. Safier (State Bar No. 197427)
  seth@gutridesafier.com
Marie A. McCrary (State Bar No. 262670)
  marie@gutridesafier.com
Kali R. Backer (State Bar No. 342492)
  kali@gutridesafier.com
100 Pine Street, Suite 1250
San Francisco, CA 94111
Telephone: (415) 639-9090
Facsimile:  (415) 449-6469

*Attorneys for Claimant*

JAMS

SAN FRANCISCO REGIONAL OFFICE

| | |
|---|---|
| TERRY DEAN MYERS, | Arbitration Case No. |
| Claimant, | COMPLAINT AND DEMAND FOR ARBITRATION |
| v. | |
| FCA US LLC, | |
| Respondent. | |

Claimant Terry Dean Myers ("Claimant") brings this action against FCA US LLC ("Respondent" or "FCA"). Claimant's allegations against FCA are based upon information and belief and upon investigation of Claimant's counsel, except for allegations specifically pertaining to Claimant, which are based upon Claimant's personal knowledge. Claimant files this Complaint and Arbitration Demand without waiver of any right or argument, specifically, and without limitation, that he did not assent to the Terms of Use found on FCA's Dodge website, including the arbitration agreement contained therein, and/or that the purported arbitration agreement is unlawful and/or unenforceable.

## **INTRODUCTION**

1. This Complaint and Arbitration Demand concerns one issue: whether a valid and enforceable arbitration agreement was formed between the parties to cover a separate dispute about Respondent's internet cookie practices that is not part of this Complaint nor at issue in this proceeding. For purposes of context, that underlying dispute relates to Claimant's visit to

COMPLAINT AND DEMAND FOR ARBITRATION

Respondent's Dodge website (www.dodge.com, the "Website"), where, despite Claimant's agreement with Respondent that it would not place tracking cookies on his device, Respondent proceeded to do so anyway.[1] As is relevant to the instant dispute, the Website also contains Terms of Use ("TOU" or "Terms") with an arbitration provision purporting to require "any dispute, claim, or controversy" between website visitors and Respondent to be resolved by binding arbitration. Claimant contends that no agreement to arbitrate was ever formed. Accordingly, he filed this arbitration demand to seek a declaration from the arbitrator that his underlying cookie dispute with Respondent is not subject to arbitration.

2.      The Website's TOU are available on the Website but accessible only via an inconspicuous link displayed in small font at the bottom of the Website after all the main content. Moreover, Respondent does not require Website users to read or agree to the Terms before browsing the Website.

3.      When Claimant visited the Website, he did not see or otherwise assent to the TOU before choosing to reject all cookies except the "Essential Cookies," which Claimant was unable to reject, and then proceeded to browse the website. Accordingly, Claimant made no agreement to arbitrate his underlying cookie dispute.

### BACKGROUND ON THE UNDERLYING COOKIE DISPUTE

4.      This underlying dispute in this matter concerns an egregious privacy violation and total breach of consumer trust in blatant violation of California law. The Website is configured to use a multitude of cookies to enable third parties to track users' activity and communications on the Website.

5.      However, at least until placed on notice by Claimant,[2] the Website presented all visitors immediately with a cookies banner indicating that, instead of accepting all cookies, users

---

[1] Respondent owns other brand websites, including, www.chrysler.com, www.jeep.com, www.ramtrucks.com, www.mopar.com, www.fiatusa.com, www.alfaromeousa.com, and www.stellantisfleet.com. Respondent engaged in the same underlying unlawful conduct regarding the placement of internet cookies on each of the websites.

[2] On or about February 7, 2024, Claimant notified Respondent of its ongoing invasions of privacy and alleged violations of law, as described herein, as required under California's Consumers Legal Remedies Act, Cal. Civil Code §§ 1750 *et seq.*, and Consumer Privacy Rights Act, Cal. Bus. & Prof. Code §§ 1798, *et seq.*

can adjust their cookie preferences by selecting or clicking the "Cookie Settings" link, as shown in the following screenshot:

We use first and third-party cookies to optimize site functionality, enhance the user experience, personalize content and ads, and provide social media and other third-party features. **Learn More**          **Cookie Settings**    **OK**

(Screenshot of the Website's cookies banner.)

6.      Users who selected the "Cookie Settings" link were directed to a cookie preference center, where Respondent represented that users could "choose to opt out of all third-party cookies on our [Website], other than those that are 'necessary'" by adjusting the settings. Accordingly, users could adjust the settings for "Performance Cookies," "Functional Cookies," "Targeting Cookies," and "Social Media Cookies," to indicate their choice/agreement to reject all cookies, except the "Essential Cookies" that users were unable to reject. Thousands of visitors to the Website, including Claimant, did just that—they selected the "Cookie Settings" link and adjusted the settings to reject all cookies, inclusive of those that enable the sale and sharing of their personal data, except the "Essential Cookies" that they were unable to reject. They then proceeded to browse the Website.

7.      Unbeknownst to Claimant and other users, however, Respondent nonetheless caused cookies—both from Respondent and third parties with notorious privacy records, including Facebook, Gigya, Mpeasylink.com, and iSpot.tv—to be stored on the devices and browsers of Claimant and those similarly situated, despite their rejection of all cookies. As a result, Respondent caused the sharing, and ultimately the sale, of broad swaths of personal data about Claimant, and similar users, to undisclosed third parties, contrary to Respondent's representations and Claimant's express directions. Respondent brings this arbitration solely to establish that the separate cookie dispute is not arbitrable.

## PARTIES

8.      Claimant Terry Dean Myers is, and was at all relevant times, an individual and resident of California. Claimant intends to remain in California and makes his permanent home there.

COMPLAINT AND DEMAND FOR ARBITRATION

9. Respondent FCA US LLC is a Delaware corporation with its headquarters and principal place of business is in Auburn Hills, Michigan. Respondent does business in California through its Website.

## SUBSTANTIVE ALLEGATIONS

### A. Respondent's Unenforceable Browsewrap Agreement.

10. Respondent's Website includes TOU that purport to govern the use of the Dodge Website. *See* TOU § 1 ("These Terms govern Your access and use of the Sites."). It is located at the following address: https://www.dodge.com/crossbrand_us/terms-of-use.html.

11. Section 14 of the TOU purports to require Website users to arbitrate all disputes with Respondent in either JAMS or AAA. *See* TOU § 14 (**"This Provision provides that all Disputes between You and FCA shall be resolved by binding arbitration. …** If this Provision applies … either You or FCA may initiate arbitration proceedings. The American Arbitration Association ("AAA"), www.adr.org, or JAMS, www.jamsadr.com, will arbitrate all Disputes, and the arbitration will be conducted before a single arbitrator.") (emphasis original).

12. Further, the TOU purport to grant exclusive authority to the arbitrator to determine issues of arbitrability. *See* TOU § 14 under the sub-heading titled "Arbitration Procedures" ("All issues shall be for the arbitrator to decide, including the scope of this Provision.").

13. Claimant, however, did not assent to the TOU or the arbitration provision contained therein. An internet contract is valid only if the user takes some action to unambiguously manifest assent to the contract after the website has placed the user on actual notice of the terms of that contract or has put a reasonably prudent user on inquiry notice of those terms. Claimant never saw the TOU, or even the hyperlink to "Terms of Use," and thus had no actual notice that his continued browsing of the Website would be subject to an arbitration agreement.

14. Nor did the Website place Claimant on inquiry notice of the TOU because it failed to provide reasonably conspicuous notice of the TOU. Moreover, Claimant took no action, such

as clicking a button or checking a box, that unambiguously manifested his assent to the TOU. The Terms on the Website are no more than an unenforceable browsewrap agreement.

15.     When users visited the Website, Respondent immediately displayed to them a cookies banner which prompted users to either adjust "Cookies Settings" or assent to the use of cookies by selecting the "OK" button. The cookies banner made no mention of the Website's TOU, contained no link to the TOU, and did not require the user to manifest assent to the Terms, as shown in the following screenshot:

We use first and third-party cookies to optimize site functionality, enhance the user experience, personalize content and ads, and provide social media and other third-party features. Learn More          Cookie Settings          OK

(Screenshot of the Website's cookies banner.)

16.     The only link to the TOU appeared in small font (identical to the surrounding font) at the very bottom of the Website following *many* other links, as shown in the following screenshots:



COMPLAINT AND DEMAND FOR ARBITRATION

(Screenshots of the Website (a) showing the many links preceding the link to TOU; and (b) the location of the TOU at the bottom of the Website.)

17.     Website users, such as Claimant, who selected and clicked the "Cookie Settings" link on the cookies banner to indicate their choice and/or agreement to adjust cookie settings were directed to an additional cookie preference center window. This window, like the cookies banner, made no mention of the TOU. On that window, users could opt-out of or reject all categories of cookies other than those essential for the operation of the Website, as shown in relevant part[3] in the screenshot below:

**[Remainder of page intentionally left blank]**

---

[3] The cookie preference center contains several tabs and screens with various statements and other representations. None of these mention the TOU or any arbitration agreement. The screenshots of the complete cookie preference center are omitted for brevity.

COMPLAINT AND DEMAND FOR ARBITRATION

(Exemplar screenshot of the operation and general appearance of the cookie preference center.)

18.     After making their selections in the cookie preference center window, users could then continue to browse the Website, as the cookies banner and cookie preference center window disappeared.

19.     The link to the TOU itself at the bottom of the Website is not conspicuous. It is not, for example, in a different color, font or size from the surrounding text. Nor is it highlighted or emboldened relative to its surrounding text. Instead, it is very small and much less conspicuous than the images and text elsewhere on the Website. Moreover, it is not available on the Website when a user first visits; rather, they must scroll down to find it, past many rows of similar-looking links, with no forewarning of being bound by the Terms.

- 7 -
COMPLAINT AND DEMAND FOR ARBITRATION

20.    Respondent never required Claimant to manifest consent to the TOU. Respondent purports to bind users to the TOU simply by their continued use of the Website, which is legally insufficient even if the notice had been conspicuous.

**B.    Claimant's Experiences**

21.    During the last year, Claimant visited the Dodge Website to browse products.

22.    When Claimant visited the Dodge Website, the Website immediately presented him with Respondent's cookies banner as it appeared at the time.

23.    Consistent with his typical practice in rejecting cookies and/or the sale of his personal data, Claimant selected and clicked the "Cookie Settings" link. Claimant was then presented with Respondent's cookies preference center window then in effect at the time. Claimant adjusted the settings to indicate Claimant's choice/agreement to reject all cookies except the "Essential Cookies," that Claimant was unable to reject, thereby giving Respondent notice that he did not consent to the use or placement of third-party cookies. Further, Claimant specifically rejected those cookies that would enable the sale or sharing of his personal data. In reliance on these representations and promises, only then did Claimant continue browsing the Website.

24.    Claimant did not see the TOU link—or the actual TOU—on the Website prior to rejecting all cookies, or at any point thereafter.

<b><u>CAUSE OF ACTION</u></b>

<b>Declaratory Judgment that the Underlying Dispute is Not Subject to Arbitration</b>

25.    Claimant realleges and incorporates the paragraphs of this Complaint as if set forth herein.

26.    The Dodge Website's TOU purports to require arbitration of any and all disputes and to waive users' rights to bring a legal action, including a class action, in court. In particular, the TOU states the following:

> **This Provision provides that all Disputes between You and FCA shall be resolved by binding arbitration.** (emphasis original) … The term **"Dispute"** means any dispute, claim, or controversy between You and FCA regarding,

COMPLAINT AND DEMAND FOR ARBITRATION

arising out of or relating to any aspect of Your relationship with FCA, whether based in contract, statute, regulation, ordinance, tort (including, but not limited to, fraud, misrepresentation, fraudulent inducement, or negligence), or any other legal or equitable cause of action or claim for relief, and includes the validity, enforceability or scope of this Provision (with the exception of the enforceability of the Class Action Waiver clause below). "Dispute" is to be given the broadest possible meaning that will be enforced, and shall include any claims against other parties in connection with the Sites or these Terms, whenever You also assert claims against Us in the same proceeding.

…

**Class Action Waiver**. Except as otherwise provided in this Provision, the arbitrator may not consolidate more than one person's claims, and may not otherwise preside over any form of a class or representative proceeding or claims (such as a class action, consolidated action, representative action, or private attorney general action) unless both You and FCA specifically agree to do so in writing following initiation of the arbitration. **If You choose to pursue Your Dispute in court by opting out of the Arbitration Provision, as specified above, this Class Action Waiver will not apply to You.** (emphasis original) Neither You, nor any other user of the Subscription Platform can be a class representative, class member, or otherwise participate in a class, consolidated, or representative proceeding without having complied with the opt-out requirements above.

…

**Jury Waiver**. You understand and agree that, by entering into these Terms, You and FCA are each waiving the right to a jury trial. In the absence of this Provision, You and might otherwise have had a right or opportunity to bring Disputes in a court, before a judge or jury, and/or to participate or be represented in a case filed in court by others (including class actions). Except as otherwise provided below, those rights are waived. Other rights that You would have if You went to court, such as the right to appeal and to certain types of discovery, may be more limited or may also be waived.

TOU § 14 (available at https://www.dodge.com/crossbrand_us/terms-of-use.html).

27.    Claimant did not view, and did not have actual notice of, Respondent's TOU, including the arbitration provision contained therein.

28.    The link to the TOU was inconspicuous and failed to provide reasonably prudent users such as Claimant with actual notice that his continued use of the Website would subject him to the TOU.

29.    Respondent did not require users such as Claimant to manifest their unambiguous assent to the TOU by clicking a button or checking a box.

COMPLAINT AND DEMAND FOR ARBITRATION

30.     Claimant, therefore, had no notice, constructive or otherwise, of the TOU and never assented to them.

31.     Because Claimant did not assent to the Terms, Claimant is entitled to, and seeks, a declaration that the arbitration provision and class action waiver contained in the TOU are unenforceable and that the underlying dispute described herein is not subject to arbitration.

## PRAYER FOR RELIEF

**WHEREFORE**, reserving all rights, Claimant respectfully requests judgment against Respondent as follows:

a.   An order declaring that Claimant did not assent to Respondent's TOU and that the underlying dispute described herein is not subject to arbitration;

b.   For reasonable attorneys' fees and the costs incurred; and

c.     For such further relief as may be just and proper.

Dated: May 2, 2025

**GUTRIDE SAFIER LLP**

*/s/ Seth A. Safier*
Seth A. Safier (State Bar No. 197427)
  seth@gutridesafier.com
Marie A. McCrary (State Bar No. 262670)
  marie@gutridesafier.com
Kali R. Backer (State Bar No. 342492)
  kali@gutridesafier.com
100 Pine Street, Suite 1250
San Francisco, CA 94111
Telephone: (415) 639-9090
Facsimile:  (415) 449-6469

*Attorneys for Claimant*

COMPLAINT AND DEMAND FOR ARBITRATION

# EXHIBIT B

**JAMS ARBITRATION CASE REFERENCE NO. 5100003070**


**Myers, Terry,**
     **Claimant(s),**


     **and**

**FCA US LLC,**
     **Respondent(s).**

_____


**ORDER AFTER CONFERENCE CALL**

As discussed at today's hearing, the parties shall engage in limited discovery aimed at the two issues immediately in controversy, as follows:

(1) Was an enforceable arbitration agreement formed?

(2) Does the failure to tender arbitration fees within 30 days of the invoice (see Code Civ. Proc., sec. 1281.98) amount to a waiver in these circumstances, taking into account the California Supreme Court's recent decision in *Hohenshelt v. Superior Court* (Aug. 11, 2025; S284498) __ Cal.5th__ [2025 WL 2302229]?

The parties shall conduct limited discovery on these issues, which shall be discussed further at the next conference call, set for October 14, 2025, at 11:00 a.m.

That discovery shall include Claimant's deposition as well as relevant interrogatories and requests for production of documents. In the event the parties are unable to agree on the scope or timing of discovery after good faith meet and confer efforts, they shall contact the case manager to set an earlier conference call with this Arbitrator.

As discussed at today's hearing, Claimant shall disclose all emails allegedly used to access Respondent's website within 14 days of this order.


Dated:  August 20, 2025

*Fred K. Morrison*
Fred K. Morrison
Arbitrator

# EXHIBIT C

**JAMS ARBITRATION CASE REFERENCE NO. 5100003070**

**Myers, Terry,**
     **Claimant(s),**

     **and**

**FCA US LLC,**
     **Respondent(s).**

---

### Order Staying Arbitration

Claimant seeks to withdraw from the arbitration. Claimant plans to file a Superior Court action, where the issue of whether Respondent's late payment of arbitration fees amounts to a waiver can be litigated. Respondent objects in part, emphasizing that this exact issue has been tendered in this arbitration, including via limited discovery pursuant to a prior order by this Arbitrator.

After considering the views stated at the hearing on December 16, 2025, it appears the parties are amenable to a stay of this arbitration pending a relevant determination by the Superior Court, in lieu of termination of this arbitration. That seems to be the most efficient and fairest resolution.

Accordingly, this arbitration shall be stayed pending a relevant order of the Superior Court. The parties are directed to provide the case manager with a joint status statement every 90 days, or upon the filing of a dispositive order by the superior court.

Until then, this arbitration will be held in abeyance.

Dated: December 17, 2025

*Fred K. Morrison*

Fred K. Morrison
Arbitrator